UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
T.H., individually and as next friend to minor child J.H.,
K.P., as next friend to minor child W.P.,
K.J., individually and as next friend to minor child J.R.,
C.J., individually and as next friend to minor child J.M.,
Y.P., individually and as next friend to minor child N.R.,
M.E., individually and as next friend to minor child D.E.,

                        Plaintiffs,

-against-

DENNIS WALCOTT, as Chancellor of the New York City
Department of Education,
the NEW YORK CITY DEPARTMENT OF EDUCATION,
the CITY OF NEW YORK, SALVATORE J. CASSANO,
as Commissioner of the Fire Department of New York,
and JOHN/ JANE DOE #'s 1-18 in their individual capacities,

                        Defendants.
------------------------------------------------------------X

2013 Civ.

COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiffs are children in New York City public schools whose educations have been forcefully interrupted because their schools have summoned Emergency Medical Services ("EMS") to have them removed by ambulances even though they were not in need of emergency medical care. In some instances, EMS personnel insisted on transporting them to hospitals against the express wishes of their families. As a result, plaintiff students have not only been detained by school and EMS personnel against their wills, they have also been traumatized by unnecessary trips to emergency rooms and deprived of valuable instructional time.

2. Plaintiffs are also the parents of these students. School and EMS procedures fail to allow parent plaintiffs to determine the nonemergency medical care for their children. In addition, school and EMS policies and practices cause these

children to be detained and then removed against the wishes of parents and guardians. Finally, school and EMS practices cause plaintiff parents to incur fees for ambulance and emergency room services that the plaintiff children did not need and that the families cannot afford.

3. The plaintiffs' ordeals have been caused by the schools' failure to utilize the systems already set up—as required by law--for evaluating children with perceived disabilities, including behavioral issues, in addition to the schools' pattern and practice of instead using EMS to remove students from their schools and forcing them to undergo emergency medical evaluations in nonemergency situations. Plaintiff students, and their families, remain at risk so long as these patterns and practices persist. At the same time, the emergency resources of New York City are misdirected at children who are not facing any emergency.

4. Plaintiffs ask this Court to find that defendants' conduct has violated their rights under federal statutory and Constitutional law, the New York State Constitution, and the New York City Human Rights Law; to enjoin defendants from continuing to violate plaintiffs' rights; and to award plaintiffs' damages for the violation of their rights.

## JURISDICTION AND VENUE

5. This court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4), and 1337. A cause of action for the federal constitutional claims is created by 42 U.S.C. § 1983. Federal claims raised here include claims arising from the U.S. Constitution, the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act of 1973, and the Americans with Disabilities Act ("ADA").

6.   This court has supplemental jurisdiction over state claims pursuant to 28 U.S.C. §1367.

7.   Declaratory and injunctive relief are authorized by 28 U.S.C. § 2201(a) and Rules 57 and 65 of the Federal Rules of Civil Procedure.

8.   Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §1391(b).

## PARTIES

*Plaintiffs*

9.   Although known to defendants, plaintiffs are named in this complaint using only their initials in order to preserve the privacy guaranteed the plaintiff children by the IDEA, as well as by Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

10.  Plaintiff T.H. is the parent of minor child J.H. and resides in the Bronx, New York

11.  Plaintiff J.H. is six years old and resides in the Bronx, New York.

12.  Plaintiff W.P. is five years old and resides in New York, New York.

13.  Plaintiff K.J. is the parent of minor child J.R. and resides in the New York, New York.

14.  Plaintiff J.R. is five years old and resides in the New York, New York.

15.  Plaintiff C.J. is the parent of minor child J.M. and resides in the New York, New York.

16.  Plaintiff J.M is fifteen years old and resides in the Bronx, New York.

17.  Plaintiff Y.P. is the parent of minor child N.R. and resides in Queens, New York.

18. Plaintiff N.R. is six years old and resides in Queens, New York.

19. Plaintiff M.E is the parent of minor child D.E. and resides in New York City, New York.

20. Plaintiff D.E. is seven years old and resides in New York City, New York.

***Defendants***

21. Defendant Dennis Walcott is the chancellor of the New York City Department of Education ("NYCDOE") and is responsible for its operation. Defendant Walcott has the power and duty to perform any duty imposed upon the NYCDOE, including the operation of all general education and special education programs and services. He is sued in his official capacity. At all times relevant to the events described herein, Defendant Walcott acted under color of law of the State of New York and in his capacity as an agent, servant, and employee of defendant New York City and/or NYCDOE, and within the scope of his employment as such.

22. Defendant New York City Department of Education is responsible for operating New York City's public schools, which are attended by approximately 1.1 million students. NYCDOE maintains its principal place of business at 52 Chambers Street in New York County. NYCDOE receives hundreds of millions of dollars in federal funding each year, including approximately $600 million in funding under Title I of the Elementary and Secondary Education Act. Defendants Dennis Walcott and NYCDOE are collectively referred to as "NYCDOE" herein.

23. Defendant the City of New York is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York. It is authorized under the laws of the State of New York to maintain a fire department, the "FDNY",

which acts as its agent in the area of Emergency Medical Services and for which it is ultimately responsible, In 2013, the FDNY received over $90 million in federal funding.

24. Defendant Salvatore J. Cassano is the commissioner of the FDNY and is responsible for its operations, including its operation of EMS. As FDNY Commissioner, Defendant Cassano has the power and duty to perform any duty imposed upon the FDNY, including the training of Emergency Medical Technicians ("EMT") responding to calls, and the implementation of regulations and rules governing EMT's and how they respond to calls, including calls to schools. He is sued in his official capacity. At all times relevant to the events described herein, Defendant Cassano acted under color of law of the State of New York and in his capacity as an agent, servant, and employee of defendant New York City and/or the FDNY, and within the scope of his employment as such.

25. Defendants John/Jane Doe #'s 1-18 are and/or were, at all times relevant herein Emergency Medical Technicians and employees and agents of the FDNY. At all times relevant to the events described herein, Defendants John/Jane Does #'s 1-18 acted under color of law of the State of New York and in their capacities as agents, servants, and employees of defendant New York City and/or FDNY, and within the scope of their employment as such. John/Jane Doe #'s 1 and 2 were responsible for removing Plaintiff J.H. from his school against his mother's wishes on November 13, 2012. John/Jane Doe #'s 3 and 4 were responsible for removing Plaintiff J.H. from his school against his mother's wishes on November 1, 2013. John/Jane Doe #'s 5 and 6 were responsible for removing Plaintiff J.R. from his school against his family's wishes on April 29, 2013. John/Jane Doe #'s 7 and 8 were responsible for removing Plaintiff J.R. from his school

against his mother's wishes on May 15, 2013. John/Jane Doe #'s 9 and 10 were responsible for removing Plaintiff N.R. from his school against his family's wishes on October 22, 2012. John/Jane Doe's 11 and 12 were responsible from removing Plaintiff D.E. from his school against his mother's wishes on September 27, 2011. John/Jane Doe #'s 13 and 14 were responsible for removing Plaintiff D.E. from his school against his family's wishes on October 6, 2011. John/Jane Doe #'s 15 and 16 were responsible for removing Plaintiff D.E. from his school against his mother's wishes on October 12, 2011. John/Jane Doe #'s 17 and 18 were responsible for removing Plaintiff D.E. against his mother's wishes on November 9, 2011.

## JURY DEMAND

26. Plaintiffs demand trial by jury in this action on each and every one of their claims.

## LEGAL FRAMEWORK

### *The United States Constitution*

27. The Fourth Amendment of the United States Constitution is made applicable to the states by the Fourteenth Amendment and provides that persons shall not be subject to unreasonable searches and seizures.

28. The Fourteenth Amendment of the United States Constitution protects individuals from deprivation of life, liberty or property without due process.

29. One of the liberties protected by the due process clause is the fundamental right of parents to make decisions concerning the care, custody and control of their children, including the right to authorize and direct the medical care given to their children.

30. The due process clause also protects the fundamental liberty interest of both parents and children not be forcibly separated from each other, even temporarily, without due process.

*Individuals with Disabilities Education Act*

31. The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq.*, governs how states and localities provide early intervention, special education, and related services to children with disabilities.

32. IDEA defines a child with a disability as "a child (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services." 20 U.S.C. §1401(3)(A).

33. Under IDEA, states must make available "a free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school." 20 U.S.C. §1412(a)(1)(A).

34. IDEA defines "free and appropriate education" as: "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. §1401(9).

35. The IDEA also mandates that "removal of children with disabilities from the regular educational environment occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C §1412(a)(5)(A).

36. Under the Child Find requirements of the IDEA, schools districts have an affirmative duty to locate, identify and evaluate students who may require special education programs or services. 20 U.S.C §1412(a)(3).

37. Either a parent or guardian or a school can make a referral to have a child evaluated for special education supports and services in New York State. 20 U.S.C. §1414 (a)(1)(B); 34 C.F.R. §300.301(b); 8 N.Y.C.R.R. §200.4(a). Schools must obtain a parent's informed consent before performing an evaluation. 34 CFR § 300.300.

38. As part of an initial evaluation and subsequent reevaluations, each school district is required to use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child" that may assist the district in determining if the child is entitled to special education services and what those services should be. 20 U.S.C. §1414 (b)(2); 34 C.F.R. §300.304 (b).

39. The school district is also required to assess the child in "all areas related to the suspected disability," including, if appropriate, the emotional status of a child and how behavioral factors impact the child. 20 U.S.C. §1414 (b)(3); 34 C.F.R. §300.304 (b)(4).

40. Following an evaluation in all areas of suspected disability, a meeting must be scheduled on written notice to the parent with a multidisciplinary team to

determine if the student meets a classification under the IDEA and to develop an Individualized Education Program (IEP) for the child. 20 U.S.C. §1414 (b)(4) and (5); 34 C.F.R. §300.306.

41. Parents are entitled to participate in an annual review of the IEP, to discuss and update the IEP and if appropriate to revise the programs, services and supports. 20 U.S.C. §1414 (d)(4); 34 C.F.R. §300.324(b).

42. Students have the right to be educated in the least restrictive environment with appropriate supports and services. 20 U.S.C. §1412 (a)(5) and (5); 34 C.F.R. §300.114.

43. For a child exhibiting behavioral issues that impact the student's educational process, the school district must conduct appropriate assessments such as a functional behavior assessment (FBA) to determine the appropriate services to address those behaviors. In addition, the school district should develop a behavioral intervention plan (BIP) on notice to and with the participation of the parent, to address the behavioral issues. 20 U.S.C. 1415 (k); 34 C.F.R. §300.530(f).

*The Rehabilitation Act*

44. The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in programs receiving federal financial assistance. 29 U.S.C. §701 *et seq.*

45. Section 504 of the Rehabilitation Act, codified at 29 U.S.C. §794, mandates that "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

46. The definition of "individual with a disability" for the purposes of Section 504 is cross-referenced to the definition found in the Americans with Disabilities Act: an individual with a disability is a person with a physical or mental impairment that substantially limits one or more major life activities of such individual; with a record of such an impairment; or who is regarded as having such an impairment. 42 U.S.C. §12102(1).

47. The definition of "program or activity" for the purposes of Section 504 includes all of the operations of both "a department, agency, special purpose district, or other instrumentality of a State or of a local government" and "a local educational agency (as defined in section 7801 of title 20), system of vocational education, or other school system." 29 U.S.C. §794(b).

48. Local educational agency is defined in 20 U.S.C. §7801 as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools."

49. 34 C.F.R. § 104.33(a) requires that recipients of federal funds who operate elementary or secondary schools must "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."

50. Under 34 C.F.R. § 104.33(d), a recipient "may not exclude any qualified handicapped person from a public elementary or secondary education . . . ."

51. Under 34 C.F.R. § 104.34(a), a recipient "shall provide for the education of each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person. A recipient shall place a handicapped person in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily."

*The Americans with Disabilities Act*

52. Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 *et seq.*, prohibits discrimination based upon disability by public entities.

53. 42 U.S.C. §12132 makes it unlawful for a qualified individual with a disability, by reason of such disability, to be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

54. Disability under the ADA is defined as a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. §12102(1).

55. A public entity is defined by the ADA as, among other things, any State or local government or any department, agency, special purpose district, or other instrumentality of a State or States or local government. 42 U.S.C. §12131(1).

56. The term "qualified individual with a disability" is defined as an individual with a disability who, with or without reasonable modifications to rules,

policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. §12131(2).

57. 28 C.F.R. §35.130(b)(3) bars public entities from utilizing methods of administration that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."

58. 28 C.F.R. §35.130(d) requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

59. 28 C.F.R. §35.130(h) prohibits public entities from imposing safety requirements based on "mere speculation, stereotypes or generalizations about individuals with disabilities."

*New York State Constitution*

60. Article I, Section 12 of the New York State Constitution guarantees the right of people to free of unreasonable searches and seizures.

*New York City Human Rights Law*

61. Pursuant to the New York City Human Rights Law, it is an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." Administrative Code of the City of New York §8-107(4)(a).

62. The term "'place or provider of public accommodation' . . . include[s] providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." Administrative Code of the City of New York §8-102(9).

63. A private cause of action for violations of the New York City Human Rights Law is created by Administrative Code of the City of New York §8-502.

64. Administrative Code of the City of New York §8-130 states that the Human Rights Law should be construed "liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed."

*DOE Chancellor's Regulations*

65. Defendant Walcott and his predecessors have issued "Chancellor's Regulations" to provide guidance to DOE personnel regarding DOE policies.

66. Each school must maintain a "school safety plan" detailing the school's policy regarding possible emergency situations. Chancellor's Regulation A-414.

67. Chancellor's Regulation A-412, Security and the Schools, requires and authorizes DOE personnel to call 911 when a student requires immediate medical attention. The principal must be contacted immediately after the 911 call and must proceed to the scene with a trained medical professional. The student's parent must also be notified immediately. If the parent is not present when the ambulance arrives, a school employee must accompany the student to the emergency room.

68. Chancellor's Regulation A-701, School Health Services, also requires and authorizes DOE personnel to call 911 when a student requires immediate medical attention, mandates that the student's parent be called, and mandates that a school employee accompany the student to the emergency room if the parent is not present when the ambulance arrives.

69. Chancellor's Regulation A-443, Student Discipline Process, requires notice and an opportunity to be heard before any student can be barred from attending their school.

*FDNY Regulations*

70. The FDNY has issued regulations to provide guidance to its EMS personnel regarding interactions with minors.

71. Section 106-05 of the FDNY EMS Operating Guide Procedures, dated March 15, 1999, describes the protocol for the "Treatment & Transport of a Minor from the Scene of an Assignment."

72. Section 106-05 authorizes transportation of minors by EMS over a parent's objection only when the minor has a life-threatening condition or injury and it is apparent that even a minor delay will jeopardize the life or health of the minor.

### STATEMENT OF FACTS

*Background*

73. The problem of abuse of emergency medical services by public schools is well-known to the city, NYCDOE, and the commissioner defendants. For almost a decade, advocates and medical practitioners have raised concerns about the improper use of emergency medical services to forcibly remove children from public schools. See, e.g., New York Times SchoolBook, Sept. 23, 2013 (quoting an emergency room

physician stating "[i]t feels like we are being used as a dumping ground by the schools"); *Hospitals Say City Schools Use them as a Cure-All*, New York Times, May 18, 2004 (quoting an emergency room physician as stating "[s]o many of the school referrals are 'dumps' of misbehaving children"); *The New Craze Schools Using ERs as Dumping Ground Educators Shuttling Surly Students to City's White Coats*, Daily News, May 17, 2004 (quoting the head of one hospital's Comprehensive Emergency Services as stating "Schools are overcrowded, teachers overworked, so they send us kids they just don't want to deal with –or don't know how to deal with them. But the kids aren't having a mental crisis," and quoting a Director of Pediatric Psychiatry as saying "A trip to the emergency room, even if it is done well, is the worst introduction to mental health services you can give a child.").

74. In response to the growing number of students being sent to hospital emergency rooms in seemingly non-urgent situations, the New York City Council Education and Mental Health Committees conducted a public hearing to investigate this issue on May 1, 2012.

75. The New York City Public Advocate's Office, under Mayor-Elect de Blasio, also raised concerns over the number of students removed from schools to hospital emergency rooms for behavioral issues. See, e.g., *Public Advocate Seeks Data on Children Sent to ER*, Wall Street Journal, (April 9, 2013) (stating that "schools are calling 911 to deal with behavioral outbursts and thousands of schoolchildren are being sent to hospitals at their parents' expense").

76. Data maintained by the defendants further demonstrates that the practice of removing children from the public schools by ambulance because of difficult or disruptive behaviors is both longstanding and widespread.

77. According to Fire Department data obtained by plaintiffs' counsel through the Freedom of Information Law, the FDNY responded to approximately 18,000 emergency calls for an emotionally disturbed person from New York City school locations from 2005 through 2010 for an average of almost 3,000 calls per calendar year. The 18,000 calls originated from over 1,000 schools from across all five boroughs.

78. The FDNY data is consistent with NYCDOE data, also obtained by plaintiff's counsel through the Freedom of Information Law, which shows that in each school year from 2009-2010 through 2011-2012, over 3,000 calls were made to EMS due to alleged disruptive behaviors. Over those three school years, the number of calls to EMS by NYC public schools to respond to students with alleged disruptive behaviors increased each year. By 2011-2012, over 3,600 calls were made to EMS by NYC public schools to respond to alleged disruptive behaviors by students. These data also show that the calls are made from hundreds of schools each year in all five boroughs.

79. Upon information and belief, the majority of students removed from New York City public schools by EMS are students with disabilities or students perceived as having a disability.

**J.H.**

80. Plaintiff J.H. is now six years old. He began attending kindergarten at Grant Avenue Elementary School in the Bronx in September 2012, when he was five. He is now in the first grade. He lives with his mother, T.H., and his eight year old

brother and his thirteen year old sister in the Bronx. J.H. has or is perceived by NYCDOE to have a disability.

81. On October 26, 2012, the school called Ms. H. and told her that an ambulance had been called for her son and that she should come to the school immediately. When Ms. H. asked what was going on, she was told it would be explained when she got to the school.

82. When Ms. H. arrived at the school, she was told that J.H. had already been taken to Lincoln Hospital. When she asked why her son had been taken to the hospital, a staff member told her that he had been acting up and that there had been no other way to control him, but did not further explain what had happened. While she was at the school, she was given a form for the hospital to sign before J.H. could return to school.

83. Ms. H. then removed her older son, T.H., from his class at Grant Avenue Elementary because she was concerned she would not return in time for his dismissal at the end of the school day. Ms. H. and T.H. rushed to the emergency room at Lincoln Hospital, where she found J.H. sitting calmly with a teacher's aide. The aide could not or would not say what had happened at the school. When Ms. H. asked J.H. what happened, he told her, "They were bothering me." According to hospital records, J.H. told hospital staff that he got into a fight with a security guard at the school when he wanted to go back to music class when he was not supposed to. Those records also say that throughout his interview with hospital staff J.H. was "well-behaved and easily redirected by prompts from his mother."

84. When Ms. H. tried to leave the emergency room with J.H., a nurse told her that she could not leave until three different staff members had met with J.H.

85. Ms. H. spent several hours in the emergency room with J.H. while he was seen by the three staff members who the hospital wanted to see him. Ms. H. desperately wanted to leave the hospital so she could pick up her daughter from school. She had no way to contact her daughter, who she knew did not have a key and would not be able to get into their apartment. She was concerned for her daughter's safety because they live in an unsafe neighborhood. The hospital would not let her leave until she received the discharge papers. When she tried to leave, hospital staff called the police and the police physically blocked her from leaving the hospital. It took about an hour from the time she tried to leave until she got the discharge papers and was finally permitted to leave.

86. By the time Ms. H., T.H. and J.H. left the hospital it was too late to pick up J.H.'s sister from school. She was waiting in their building, locked out of the apartment.

87. On the next school day, Ms. H. brought J.H. to school and gave the school the form from the hospital. She was given no written incident report for the October 26 incident and was told nothing more than that the school's staff had been unable to calm him down and that he had been jumping, running around, and hitting people.

88. On November 13, 2012, the school again phoned Ms. H. and told her an ambulance had been called for her son. Ms. H. rushed to the school. This time, she arrived at the school prior to J.H.'s being removed by EMS. She found him between a window gate and a closed window in a stairwell surrounded by close to ten adults

including EMS personnel, police, and school employees. She coaxed him into her arms, but when she said she wanted to bring him home, she was told by school employees and by EMS staff that he had to be taken to the hospital.

89. Ms. H. again removed T.H. from class so he could accompany her and J.H. to the hospital. Ms. H. was again concerned that she would not be able to return to Grant Avenue Elementary in time for dismissal for T.H.

90. Ms. H. and T.H. accompanied J.H. to Lincoln Hospital in the ambulance and this time the hospital signed the paperwork to permit J.H. to return to school and released him in less than an hour. Then they went home. According to hospital records, J.H. was referred to the hospital for evaluation for "not listening" and because he "refused to sit on a rug."

91. Again, by the time they were permitted to leave the hospital, J.H.'s sister was home from school, locked out of the apartment, and Ms. H. was unable to contact her. Because of these repeated incidents and in fear for her daughter's safety, she bought her daughter a cell phone so that they could contact each other if Ms. H. had to go to the hospital with J.H. again.

92. On the next school day, Ms. H. brought J.H. to school and gave the school the form from the hospital. She was given no written incident report regarding what had happened on November 13 and was told only that he had been running, jumping around, and hitting people.

93. After the November 13 incident, Ms. H. asked for and received permission to observe her son at school without his knowledge. She did so on several occasions and never saw him engage in aggressive or out-of-control behavior. Ms. H.