UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
T.H., individually and as next friend to minor child J.H.,
K.P., as next friend to minor child W.P.,                                          2013 Civ. 8777
K.J., individually and as next friend to minor child J.R.,
C.J., individually and as next friend to minor child J.M.,
Y.P., individually and as next friend to minor child N.R.,                         AMENDED
M.E., individually and as next friend to minor child D.E.,                         COMPLAINT
T.W., individually and as next friend to minor child A.A.,
A.D., individually and as next friend to the minor child S.D.,
N.C.R., individually and as next friend to the minor child C.R.,
I.S., individually and as next friend to the minor child Q.A., and
R.M.T., individually and as next friend to the minor child R.T.,

                                            Plaintiffs,

-against-

CARMEN FARIÑA, as Chancellor of the New York City
Department of Education,
the NEW YORK CITY DEPARTMENT OF EDUCATION,
the CITY OF NEW YORK, SALVATORE J. CASSANO,
as Commissioner of the Fire Department of New York,
and JOHN/ JANE DOE #'s 1-24 in their individual capacities,

Defendants.
------------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.      Plaintiffs are children in New York City public schools whose educations have been forcefully interrupted because their schools have summoned Emergency Medical Services ("EMS") to have them removed by ambulances even though they were not in need of emergency medical care.  In some instances, EMS personnel insisted on transporting them to hospitals against the express wishes of their families. As a result, plaintiff students have not only been detained by school and EMS personnel against their wills, they have also been traumatized by unnecessary trips to emergency rooms and deprived of valuable instructional time.

2.      Plaintiffs are also the parents of these students.  School and EMS procedures fail to allow parent plaintiffs to determine the nonemergency medical care for their children.  In addition, school and EMS policies and practices cause these children to be detained and then removed against the wishes of parents and guardians. Finally, school and EMS practices cause plaintiff parents to incur fees for ambulance and emergency room services that the plaintiff children did not need and that the families cannot afford.

3.      The plaintiffs' ordeals have been caused by the schools' failure to utilize the systems already set up—as required by law--for evaluating children with perceived disabilities, including behavioral issues, in addition to the schools' pattern and practice of instead using EMS to remove students from their schools and forcing them to undergo emergency medical evaluations in nonemergency situations.  Plaintiff students, and their families, remain at risk so long as these patterns and practices persist. At the same time, the emergency resources of New York City are misdirected at children who are not facing any emergency.

4.      Plaintiffs ask this Court to find that defendants' conduct has violated their rights under federal statutory and Constitutional law, the New York State Constitution, and the New York City Human Rights Law; to enjoin defendants from continuing to violate plaintiffs' rights; and to award plaintiffs' damages for the violation of their rights.

**JURISDICTION AND VENUE**

5.      This court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4), and 1337.  A cause of action for the federal constitutional claims is created by 42 U.S.C. § 1983.  Federal claims raised here include

claims arising from the U.S. Constitution, the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act of 1973, and the Americans with Disabilities Act ("ADA").

6.     This court has supplemental jurisdiction over state claims pursuant to 28 U.S.C. §1367.

7.     Declaratory and injunctive relief are authorized by 28 U.S.C. § 2201(a) and Rules 57 and 65 of the Federal Rules of Civil Procedure.

8.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §1391(b).

## PARTIES

### *Plaintiffs*

9.     Although known to defendants, plaintiffs are named in this complaint using only their initials in order to preserve the privacy guaranteed the plaintiff children by the IDEA, as well as by Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

10.     Plaintiff T.H. is the parent of minor child J.H. and resides in the Bronx, New York

11.     Plaintiff J.H. is six years old and resides in the Bronx, New York.

12.     Plaintiff W.P. is five years old and resides in New York, New York.

13.     Plaintiff K.J. is the parent of minor child J.R. and resides in the New York, New York.

14.     Plaintiff J.R. is five years old and resides in the New York, New York.

15.     Plaintiff C.J. is the parent of minor child J.M. and resides in the New York, New York.

16.     Plaintiff J.M is fifteen years old and resides in the Bronx, New York.

17.     Plaintiff Y.P. is the parent of minor child N.R. and resides in Queens, New York.

18.     Plaintiff N.R. is six years old and resides in Queens, New York.

19.     Plaintiff M.E is the parent of minor child D.E. and resides in New York City, New York.

20.     Plaintiff D.E. is seven years old and resides in New York City, New York.

21.     Plaintiff T.W. is the parent of minor child A.A. and resides in Brooklyn, New York.

22.     Plaintiff A.A. is eleven years old and resides in Brooklyn, New York.

23.     Plaintiff A.D. is the parent of minor child S.D. and resides in Queens, New York.

24.     Plaintiff S.D. is eight years old and resides in Queens, New York.

25.     Plaintiff N.C.R. is the parent of minor child C.R. and resides in the Bronx, New York.

26.     Plaintiff C.R. is six years old and resides in the Bronx, New York.

27.     Plaintiff I.S. is the parent of minor child Q.A. and resides in the Bronx, New York.

28.     Plaintiff Q.A. is twelve years old and resides in the Bronx, New York.

29.     Plaintiff R.M.T. is the parent of minor child R.T. and resides in New York City, New York.

30.     Plaintiff R.T. is five years old and resides in New York City, New York.

*Defendants*

31.     Defendant Carmen Fariña is the chancellor of the New York City Department of Education ("NYCDOE") and is responsible for its operation.  Defendant Fariña  has the power and duty to perform any duty imposed upon the NYCDOE, including the operation of all general education and special education programs and services.  She is sued in her  official capacity.  At all times relevant to the events described herein, Defendant  Fariña  and her predecessor,  Dennis Walcott, acted under color of law of the State of New York and in their  capacity as  agents, servants, and employees of defendant New York City and/or NYCDOE, and within the scope of their employment as such.

32.     Defendant New York City Department of Education is responsible for operating New York City's public schools, which are attended by approximately 1.1 million students.  NYCDOE maintains its principal place of business at 52 Chambers Street in New York County.  NYCDOE receives hundreds of millions of dollars in federal funding each year, including approximately $600 million in funding under Title I of the Elementary and Secondary Education Act. Defendants Carmen  Fariña and NYCDOE are collectively referred to as "NYCDOE" herein.

33.     Defendant the City of New York is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  It is authorized under the laws of the State of New York to maintain a fire department, the "FDNY", which acts as its agent in the area of Emergency Medical Services and for which it is ultimately responsible, In 2013, the FDNY received over $90 million in federal funding.

34.     Defendant Salvatore J. Cassano is the commissioner of the FDNY and is responsible for its operations, including its operation of EMS.  As FDNY

Commissioner, Defendant Cassano has the power and duty to perform any duty imposed upon the FDNY, including the training of Emergency Medical Technicians ("EMT") responding to calls, and the implementation of regulations and rules governing EMT's and how they respond to calls, including calls to schools. He is sued in his official capacity. At all times relevant to the events described herein, Defendant Cassano acted under color of law of the State of New York and in his capacity as an agent, servant, and employee of defendant New York City and/or the FDNY, and within the scope of his employment as such.

35.     Defendants John/Jane Doe #'s 1-24 are and/or were, at all times relevant herein Emergency Medical Technicians and employees and agents of the FDNY.   At all times relevant to the events described herein, Defendants John/Jane Does #'s 1-24 acted under color of law of the State of New York and in their capacities as agents, servants, and employees of defendant New York City and/or FDNY, and within the scope of their employment as such. John/Jane Doe #'s 1 and 2 were responsible for removing Plaintiff J.H. from his school against his mother's wishes on November 13, 2012. John/Jane Doe #'s 3 and 4 were responsible for removing Plaintiff J.H. from his school against his mother's wishes on November 1, 2013. John/Jane Doe #'s 5 and 6 were responsible for removing Plaintiff J.R. from his school against his family's wishes on April 29, 2013. John/Jane Doe #'s 7 and 8 were responsible for removing Plaintiff J.R. from his school against his mother's wishes on May 15, 2013. John/Jane Doe #'s 9 and 10 were responsible for removing Plaintiff N.R. from his school against his family's wishes on October 22, 2012. John/Jane Doe's 11 and 12 were responsible from removing Plaintiff D.E. from his school against his mother's wishes on September 27, 2011. John/Jane

Doe #'s 13 and 14 were responsible for removing Plaintiff D.E. from his school against his family's wishes on October 6, 2011.  John/Jane Doe #'s 15 and 16 were responsible for removing Plaintiff D.E. from his school against his mother's wishes on October 12, 2011.  John/Jane Doe #'s 17 and 18 were responsible for removing Plaintiff D.E. against his mother's wishes on November 9, 2011.   John/Jane Doe #'s 19 and 20 were responsible for removing Plaintiff A.A. against his mother's wishes on November 6, 2012.  John/Jane Doe #'s 21 and 22 were responsible for removing Plaintiff S.D. against his mother's wishes on October 31, 2013.  John/Jane Doe #'s 23 and 24 were responsible for removing Plaintiff R.T. against his mother's wishes on November 15, 2013.

## JURY DEMAND

36.     Plaintiffs demand trial by jury in this action on each and every one of their claims.

## LEGAL FRAMEWORK

### The United States Constitution

37.     The Fourth Amendment of the United States Constitution is made applicable to the states by the Fourteenth Amendment and provides that persons shall not be subject to unreasonable searches and seizures.

38.     The Fourteenth Amendment of the United States Constitution protects individuals from deprivation of life, liberty or property without due process.

39.     One of the liberties protected by the due process clause is the fundamental right of parents to make decisions concerning the care, custody and control of their children, including the right to authorize and direct the medical care given to their children.

40.     The due process clause also protects the fundamental liberty interest of both parents and children not be forcibly separated from each other, even temporarily, without due process.

**Individuals with Disabilities Education Act**

41.     The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq*., governs how states and localities provide early intervention, special education, and related services to children with disabilities.

42.     IDEA defines a child with a disability as "a child (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services." 20 U.S.C. §1401(3)(A).

43.     Under IDEA, states must make available "a free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school."  20 U.S.C. §1412(a)(1)(A).

44.     IDEA defines "free and appropriate education" as: "special education and related services that  (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."  20 U.S.C.  §1401(9).

45.     The IDEA also mandates that "removal of children with disabilities from the regular educational environment occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C §1412(a)(5)(A).

46.     Under the Child Find requirements of the IDEA, schools districts have an affirmative duty to locate, identify and evaluate students who may require special education programs or services. 20 U.S.C §1412(a)(3).

47.     Either a parent or guardian or a school can make a referral to have a child evaluated for special education supports and services in New York State. 20 U.S.C. §1414 (a)(1)(B); 34 C.F.R. §300.301(b); 8 N.Y.C.R.R. §200.4(a).  Schools must obtain a parent's informed consent before performing an evaluation.  34 CFR § 300.300.

48.     As part of an initial evaluation and subsequent reevaluations, each school district is required to use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child" that may assist the district in determining if the child is entitled to special education services and what those services should be. 20 U.S.C. §1414 (b)(2); 34 C.F.R. §300.304 (b).

49.     The school district is also required to assess the child in "all areas related to the suspected disability," including, if appropriate, the emotional status of a child and how behavioral factors impact the child. 20 U.S.C. §1414 (b)(3); 34 C.F.R. §300.304 (b)(4).

50.     Following an evaluation in all areas of suspected disability, a meeting must be scheduled on written notice to the parent with a multidisciplinary team to

determine if the student meets a classification under the IDEA and to develop an Individualized Education Program (IEP) for the child. 20 U.S.C. §1414 (b)(4) and (5); 34 C.F.R. §300.306.

51.     Parents are entitled to participate in an annual review of the IEP, to discuss and update the IEP and if appropriate to revise the programs, services and supports. 20 U.S.C. §1414 (d)(4);  34 C.F.R. §300.324(b).

52.     Students have the right to be educated in the least restrictive environment with appropriate supports and services. 20 U.S.C. §1412 (a)(5) and (5);  34 C.F.R. §300.114.

53.     For a child exhibiting behavioral issues that impact the student's educational process, the school district must conduct appropriate assessments such as a functional behavior assessment (FBA) to determine the appropriate services to address those behaviors. In addition, the school district should develop a behavioral intervention plan (BIP) on notice to and with the participation of the parent, to address the behavioral issues. 20 U.S.C. 1415 (k); 34 C.F.R. §300.530(f).

***The Rehabilitation Act***

54.     The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in programs receiving federal financial assistance.  29 U.S.C. §701 *et seq.*

55.     Section 504 of the Rehabilitation Act, codified at 29 U.S.C. §794, mandates that "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

56.     The definition of "individual with a disability" for the purposes of Section 504 is cross-referenced to the definition found in the Americans with Disabilities Act: an individual with a disability is a person with a physical or mental impairment that substantially limits one or more major life activities of such individual; with a record of such an impairment; or who is regarded as having such an impairment. 42 U.S.C. §12102(1).

57.     The definition of "program or activity" for the purposes of Section 504 includes all of the operations of both "a department, agency, special purpose district, or other instrumentality of a State or of a local government" and "a local educational agency (as defined in section 7801 of title 20), system of vocational education, or other school system." 29 U.S.C. §794(b).

58.     Local educational agency is defined in 20 U.S.C. §7801 as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools."

59.     34 C.F.R. § 104.33(a) requires that recipients of federal funds who operate elementary or secondary schools must "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."

60.     Under 34 C.F.R. § 104.33(d), a recipient "may not exclude any qualified handicapped person from a public elementary or secondary education . . . ."

61.     Under 34 C.F.R. § 104.34(a), a recipient "shall provide for the education of each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person. A recipient shall place a handicapped person in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily."

**The Americans with Disabilities Act**

62.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 *et seq.*, prohibits discrimination based upon disability by public entities.

63.     42 U.S.C. §12132 makes it unlawful for a qualified individual with a disability, by reason of such disability, to be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

64.     Disability under the ADA is defined as a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment.  42 U.S.C. §12102(1).

65.     A public entity is defined by the ADA as, among other things, any State or local government or any department, agency, special purpose district, or other instrumentality of a State or States or local government.  42 U.S.C. §12131(1).

66.     The term "qualified individual with a disability" is defined as an individual with a disability who, with or without reasonable modifications to rules,

policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. §12131(2).

67.     28 C.F.R. §35.130(b)(3) bars public entities from utilizing methods of administration that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."

68.     28 C.F.R. §35.130(d) requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

69.     28 C.F.R. §35.130(h) prohibits public entities from imposing safety requirements based on "mere speculation, stereotypes or generalizations about individuals with disabilities."

***New York State Constitution***

70.     Article I, Section 12 of the New York State Constitution guarantees the right of people to free of unreasonable searches and seizures.

***New York City Human Rights Law***

71.     Pursuant to the New York City Human Rights Law, it is an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . .  disability to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."  Administrative Code of the City of New York §8-107(4)(a).

72.     The term "'place or provider of public accommodation' . . . include[s] providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available."  Administrative Code of the City of New York §8-102(9).

73.     A private cause of action for violations of the New York City Human Rights Law is created by Administrative Code of the City of New York §8-502.

74.     Administrative Code of the City of New York §8-130 states that the Human Rights Law should be construed "liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed."

***NYCDOE Chancellor's Regulations***

75.     Defendant  Fariña  and her predecessors have issued "Chancellor's Regulations" to provide guidance to NYCDOE personnel regarding NYCDOE policies.

76.     Each school must maintain a "school safety plan" detailing the school's policy regarding possible emergency situations.  Chancellor's Regulation A-414.

77.     Chancellor's Regulation A-412, Security and the Schools, requires and authorizes NYCDOE personnel to call 911 when a student requires immediate medical attention.  The principal must be contacted immediately after the 911 call and must proceed to the scene with a trained medical professional.  The student's parent must also be notified immediately.  If the parent is not present when the ambulance arrives, a school employee must accompany the student to the emergency room.

78.     Chancellor's Regulation A-701, School Health Services, also requires and authorizes NYCDOE personnel to call 911 when a student requires immediate medical attention, mandates that the student's parent be called, and mandates that a school employee accompany the student to the emergency room if the parent is not present when the ambulance arrives.

79.     Chancellor's Regulation A-443, Student Discipline Process, requires notice and an opportunity to be heard before any student can be barred from attending their school.

*FDNY Regulations*

80.     The FDNY has issued regulations to provide guidance to its EMS personnel regarding interactions with minors.

81.     Section 106-05 of the FDNY EMS Operating Guide Procedures, dated March 15, 1999, describes the protocol for the "Treatment & Transport of a Minor from the Scene of an Assignment."

82.     Section 106-05 authorizes transportation of minors by EMS over a parent's objection only when the minor has a life-threatening condition or injury and it is apparent that even a minor delay will jeopardize the life or health of the minor.

## STATEMENT OF FACTS

*Background*

83.     The problem of abuse of emergency medical services by public schools is well-known to the city, NYCDOE, and the commissioner defendants. For almost a decade, advocates and medical practitioners have raised concerns about the improper use of emergency medical services to forcibly remove children from public schools. See, e.g., New York Times SchoolBook, Sept. 23, 2013 (quoting an emergency room

physician stating "[i]t feels like we are being used as a dumping ground by the schools"); *Hospitals Say City Schools Use them as a Cure-All*, New York Times, May 18, 2004 (quoting an emergency room physician as stating "[ s]o many of the school referrals are 'dumps'  of misbehaving children"); *The New Craze Schools Using ERs as Dumping Ground Educators Shuttling Surly Students to City's White Coats*, Daily News, May 17, 2004 (quoting the head of one hospital's Comprehensive Emergency Services as stating "Schools are overcrowded, teachers overworked, so they send us kids they just don't want to deal with –or don't know how to deal with them. But the kids aren't having a mental crisis," and quoting a Director of Pediatric Psychiatry as saying "A trip to the emergency room, even if it is done well, is the worst introduction to mental health services you can give a child.").

84.     In response to the growing number of students being sent to hospital emergency rooms in seemingly non-urgent situations, the New York City Council Education and Mental Health Committees conducted a public hearing to investigate this issue on May 1, 2012.

85.     The New York City Public Advocate's Office, under Mayor-Elect de Blasio, also raised concerns over the number of students removed from schools to hospital emergency rooms for behavioral issues. See, e.g., *Public Advocate Seeks Data on Children Sent to ER*, Wall Street Journal, (April 9, 2013) (stating that "schools are calling 911 to deal with behavioral outbursts and thousands of schoolchildren are being sent to hospitals at their parents' expense").

86.     Data maintained by the defendants further demonstrates that the practice of removing children from the public schools by ambulance because of difficult or disruptive behaviors is both longstanding and widespread.

87.     According to Fire Department data obtained by plaintiffs' counsel through the Freedom of Information Law, the FDNY responded to approximately 18,000 emergency calls for an emotionally disturbed person from New York City school locations from 2005 through 2010 for an average of almost 3,000 calls per calendar year. The 18,000 calls originated from over 1,000 schools from across all five boroughs.

88.     The FDNY data is consistent with NYCDOE data, also obtained by plaintiff's counsel through the Freedom of Information Law, which shows that in each school year from 2009-2010 through 2011-2012, over 3,000 calls were made to EMS due to alleged disruptive behaviors.  Over those three school years, the number of calls to EMS by NYC public schools to respond to students with alleged disruptive behaviors increased each year.  By 2011-2012, over 3,600 calls were made to EMS by NYC public schools to respond to alleged disruptive behaviors by students. These data also show that the calls are made from hundreds of schools each year in all five boroughs.

89.     Upon information and belief, the majority of students removed from New York City public schools by EMS are students with disabilities or students perceived as having a disability.

**J.H.**

90.     Plaintiff J.H. is now six years old.  He began attending kindergarten at Grant Avenue Elementary School in the Bronx in September 2012, when he was five. He is now in the first grade.  He lives with his mother, T.H., and his eight year old

brother and his thirteen year old sister in the Bronx.  J.H. has or is perceived by NYCDOE to have a disability.

91.     On October 26, 2012, the school called Ms. H. and told her that an ambulance had been called for her son and that she should come to the school immediately.  When Ms. H. asked what was going on, she was told it would be explained when she got to the school.

92.     When Ms. H. arrived at the school, she was told that J.H. had already been taken to Lincoln Hospital.  When she asked why her son had been taken to the hospital, a staff member told her that he had been acting up and that there had been no other way to control him, but did not further explain what had happened. While she was at the school, she was given a form for the hospital to sign before J.H. could return to school.

93.     Ms. H. then removed her older son, T.H., from his class at Grant Avenue Elementary because she was concerned she would not return in time for his dismissal at the end of the school day. Ms. H. and T.H. rushed to the emergency room at Lincoln Hospital, where she found J.H. sitting calmly with a teacher's aide. The aide could not or would not say what had happened at the school.  When Ms. H. asked J.H. what happened, he told her, "They were bothering me."  According to hospital records, J.H. told hospital staff that he got into a fight with a security guard at the school when he wanted to go back to music class when he was not supposed to.  Those records also say that throughout his interview with hospital staff J.H. was "well-behaved and easily redirected by prompts from his mother."

94.     When Ms. H. tried to leave the emergency room with J.H., a nurse told her that she could not leave until three different staff members had met with J.H.

95.     Ms. H. spent several hours in the emergency room with J.H. while he was seen by the three staff members who the hospital wanted to see him. Ms. H. desperately wanted to leave the hospital so she could pick up her daughter from school. She had no way to contact her daughter, who she knew did not have a key and would not be able to get into their apartment. She was concerned for her daughter's safety because they live in an unsafe neighborhood. The hospital would not let her leave until she received the discharge papers. When she tried to leave, hospital staff called the police and the police physically blocked her from leaving the hospital. It took about an hour from the time she tried to leave until she got the discharge papers and was finally permitted to leave.

96.     By the time Ms. H., T.H. and J.H. left the hospital it was too late to pick up J.H.'s sister from school. She was waiting in their building, locked out of the apartment.

97.     On the next school day, Ms. H. brought J.H. to school and gave the school the form from the hospital.  She was given no written incident report for the October 26 incident and was told nothing more than that the school's staff had been unable to calm him down and that he had been jumping, running around, and hitting people.

98.     On November 13, 2012, the school again phoned Ms. H. and told her an ambulance had been called for her son.  Ms. H. rushed to the school. This time, she arrived at the school prior to J.H.'s being removed by EMS.  She found him between a window gate and a closed window in a stairwell surrounded by close to ten adults

including EMS personnel, police, and school employees.  She coaxed him into her arms, but when she said she wanted to bring him home, she was told by school employees and by EMS staff that he had to be taken to the hospital.

99.     Ms. H. again removed T.H. from class so he could accompany her and J.H. to the hospital. Ms. H. was again concerned that she would not be able to return to Grant Avenue Elementary in time for dismissal for T.H.

100.    Ms. H. and T.H. accompanied J.H. to Lincoln Hospital in the ambulance and this time the hospital signed the paperwork to permit J.H. to return to school and released him in less than an hour. Then they went home. According to hospital records, J.H. was referred to the hospital for evaluation for "not listening" and because he "refused to sit on a rug."

101.    Again, by the time they were permitted to leave the hospital, J.H.'s sister was home from school, locked out of the apartment, and Ms. H. was unable to contact her. Because of these repeated incidents and in fear for her daughter's safety, she bought her daughter a cell phone so that they could contact each other if Ms. H. had to go to the hospital with J.H. again.

102.    On the next school day, Ms. H. brought J.H. to school and gave the school the form from the hospital.  She was given no written incident report regarding what had happened on November 13 and was told only that he had been running, jumping around, and hitting people.

103.    After the November 13 incident, Ms. H. asked for and received permission to observe her son at school without his knowledge.  She did so on several occasions and never saw him engage in aggressive or out-of-control behavior. Ms. H.

wanted to try moving J.H. to another teacher to see if that would help with the behavior problems, but the school would not permit J.H. to move, even though several other children had already been moved out of his classroom.

104.    On December 12, 2012, the school again called Ms. H. to tell her they had called EMS to take J.H. to the hospital.  Ms. H. rushed to the school.  When she got there, she was told that J.H. had already been taken to Lincoln Hospital by ambulance.

105.    Ms. H. rushed to Lincoln Hospital, but when she arrived there, she was told that her son was not there.  She frantically called the school, worried that the ambulance might have been in an accident, and she was told that her son had actually been taken to St. Barnabas Hospital. It took her a long time to get to the correct hospital because she did not have money for a cab and had to take the bus to both hospitals. She had to call a friend from Lincoln Hospital for directions because she did not know where St. Barnabas Hospital was or which bus to take to get there.

106.    At St. Barnabas, she found J.H. in a psychiatric ward with six adults.  He had been changed out of his clothes and into hospital-issued pajamas: a pajama shirt, pajama pants, and slipper socks. A person from the school was there with him.

107.    According to hospital records, the aide told emergency room staff that J.H. had been "out of control at school.  They didn't know what to do."  The same records state that J.H. was "playful" and "smiling" at the hospital.

108.    After spending about an hour at the hospital, Ms. H. was permitted to bring J.H. home. Ms. H. was in a rush to leave the hospital because she was worried about leaving in time to pick up T.H. from school.

109.    On the next school day, Ms. H. accompanied J.H. to school and gave the school staff the necessary paperwork from the hospital.  Again, she was given no written incident report regarding what had happened on December 12. She was told only that J.H. had not been listening, ran out of the classroom, and hit students and teachers.

110.    On December 14, 2012, the school again called Ms. H and told her that they had called an ambulance for J. H.  When she got to the school, she found J.H. outside, strapped down to a stretcher wearing only a t-shirt on the cold December day. All of the staff members were wearing coats but J.H. was strapped to the stretcher crying without any coat or sweater. Ms. H. gave J.H. her coat. She became very upset at the school staff and began crying herself. As she prepared to ride in the ambulance with J.H. to the hospital, she pulled T.H. out of school again because she was worried that she would not be able to return in time to pick him up from school. T.H. was at lunch at that time, so they brought his lunch with them and also brought J.H.'s lunch to the ambulance. Ms. H., J.H., and T.H. all rode together in the ambulance to Lincoln Hospital.

111.    According to hospital notes, J.H. was sent to the hospital because he had hit and kicked his teacher after she drew on his paper when he did not want her to.  He told the hospital staff that his teacher does not like him and that she makes him angry a lot.  The notes also indicate that J.H. was "well-behaved and easily redirected by prompts from his mother."

112.        After Ms. H., J.H., and T.H. spent an hour or two in the emergency room, she was given the signed clearance form she needed to give to the school and was permitted to take J.H. home.

113.    On the next school day, Ms. H. brought J.H. to school and gave the school the form from the hospital.  She was given no written incident report regarding what had happened on December 14 and was told nothing more than the school's staff had been unable to calm him down after he became upset over something his teacher did.

114.    School staff stopped calling EMS for J.H. after an attorney began advocating on Ms. H. and J.H.'s behalf in late December 2012.The school instead required Ms. H. to pick J.H. up early almost every day for about a month. School staff then required J.H. to attend school on a part-time schedule and J.H. only attended school until 11:00 a.m. for the rest of the 2012-2013 school year. School staff also prohibited him from attending field trips unless accompanied by Ms. H.

115.    Ms. H. lost her job as a night guard at a homeless shelter. Ms. H. suffered poor work performance as a result of the nearly daily calls from school officials regarding J.H.'s behavior. Unable to get adequate sleep during the morning hours, she repeatedly was too tired to stay awake at work. She then went on unemployment, went into arrears with her rent and currently is facing eviction  She then got a job as a customer service representative in August 2013 but had to leave the job a month later partly due to multiple appointments she has to attend to regarding the eviction proceedings.  She has also received bills from the hospitals and from EMS, which she has no way to pay.

116.    Ms. H. consented to have J.H. evaluated by the NYCDOE for special education services in November 2012. The NYCDOE administered a psychological and

an educational evaluation for J.H. but never conducted a psychiatric evaluation as part of their initial evaluation.

117.    Upon information and belief, while awaiting the completion of the special education evaluation process, school officials did not provide J.H. with any formal services or accommodations to address J.H.'s behaviors.

118.    On January 18, 2013, an IEP meeting was held at the school and J.H. was found to be eligible for special education services and J.H. was given a classification of emotional disturbance. For the 2013-2014 school year, J.H. is enrolled in a 12:1:1 special class program at Grant Avenue Elementary School.

119.    On or about November 1, 2013, school officials from Grant Avenue Elementary School called Ms. H. and advised her that J.H. was acting out and Ms. H. needed to go to the school right away. Ms. H. was also told that J.H. was in the guidance counselor's office.

120.    Ms. H. proceeded to the school right after the phone call. Upon arriving at the school, Ms. H. proceeded to the guidance counselor's office where she found her son J.H. being physically held by the school safety agent. Ms. H. asked the school safety agent to let J.H. go and she picked him up. Ms. H. spoke to the school safety agent who advised her that J.H. would be sent to the emergency room. Ms. H. asked school staff why EMS was called if the school officials knew she was on her way to the school. The school safety agent interjected and stated that it was her decision to call EMS.

121.    When EMS arrived, Ms. H. asked the EMT's if they had to take J.H. and she was told J.H. had to go to the hospital. Ms. H. then accompanied J.H. to Lincoln Hospital along with T.H., whom she removed from school early again. Once at the

hospital, the nurse gave Ms. H.  a document to sign to consent to the evaluation of J.H..

Ms. H. declined to sign it because she did not believe J.H. needed an evaluation at that

time and left the hospital with her sons.

122.    J.H. received an in-school suspension as a result of this incident but

returned to school on the next school day. Ms. H. never received any documents related

to the incident on November 1, 2013.

123.    As a result of the school's practice of repeatedly having J.H. removed by

EMS, J.H. is no longer eager to go to school, is afraid of and dislikes the police, and is

afraid of going to the hospital.

**_W.P._**

124.    W.P. is five years old and resides in Manhattan with his parents, K.P. and

G.P. and his newborn brother.  Since September 9, 2013, he has attended kindergarten at

NEST+M School ("NEST") in Manhattan. W.P. has or is perceived by NYDOE as

having a disability.

125.    On Friday, September 20, 2013, K.P. received a telephone call from the

assistant principal for the Lower School.  Without providing any details or explanation,

the assistant principal informed K.P. that the school was unable to control W.P.'s

behavior and that they had called 911 to transport W.P. to the emergency room.  K.P.,

who works in midtown Manhattan and at the time was nine months pregnant, was told

she had 10-20 minutes to get to the school before EMS would take W.P. to the hospital.

K.P. pleaded with the school to wait for her arrival before having W.P. removed.  The

school insisted they would not wait.

126.    K.P. alerted her husband, G.P., to the situation, and G.P. was able to

reach the school before W.P. had been taken to the hospital.  Upon G.P.'s arrival at

NEST, he found W.P. sitting calmly and quietly in the main school office with his feet

up on a chair.  Five police officers stood at the entrance to the office.  G.P. immediately

asked the police officers to call off the request for EMS.

127.    G.P. met with the assistant principal and the principal in the principal's

office to discuss the incident.  G.P. was informed that W.P. had been "running around

and almost broke a table," and was like a "mini Hulk."  W.P.'s teacher and the school's

guidance counselor subsequently joined the conversation in the principal's office.  The

school representatives explained to G.P. that W.P. had been pulled out of class and was

unable to "calm down."  The assistant principal informed G.P. that in such situations,

when there is allegedly concern for the child's safety or the safety of others, it is the

school's policy to call EMS.  The assistant principal described the policy in front of the

principal, who nodded in agreement.  G.P. has since had at least one additional

conversation in which this policy was reiterated by other school representatives. At

times, school officials also stated that it is their policy to call the security guard, who in

turn has been trained to call EMS.

128.    Despite W.P.'s calm demeanor, G.P. decided to take W.P. home for the

rest of the day.  G.P. was able to coax an explanation from W.P. for his behavior, which

evidently resulted from a simple disagreement with another student on the playground

who had refused to return a ball.

129.    Two weeks later, in the midst of K.P.'s giving birth to W.P.'s brother by

caesarian section, G.P. received a message that the school had again called EMS to

remove W.P. from school.  After the birth of their new son, G.P. called the school and

spoke to a police officer who was present at the school.  At this point, G.P. was told that

W.P. was sitting calmly in the office, and G.P. informed the police officer again that he did not want W.P. to be removed by EMS.  G.P. informed both the police officer and the assistant principal that his mother-in-law would arrive shortly at the school, since he was at the hospital with his wife, who had just given birth.

130.    K.P.'s mother arrived at NEST within twenty minutes, but W.P. had nonetheless already been taken to the Beth Israel emergency room, apparently by police officers.  K.P.'s mother rushed to the hospital and reached W.P. before he had been formally admitted.  When she found him, W.P. was sitting quietly with two police officers and a paraprofessional from NEST who had accompanied him to the hospital.

131.    After the October 3 incident, K.P.'s mother volunteered to spend time at NEST with W.P. for a few days in the hope that the school would avoid repeating such drastic measures.

132.    On October 16, 2013, NEST's guidance counselor again called G.P. to inform him that the school had once again called EMS to remove W.P.  G.P. contacted K.P., who rushed to the school with her two-week-old son.  Upon her arrival, K.P. found W.P. calmly sitting at a table with the principal and three police officers in the office.

133.    K.P. requested immediately that the police officers call off the request for EMS; however, the ambulance arrived at the school nonetheless.  K.P. insisted that her calm child need not be transported to the hospital and signed a release form at EMS' request.  At K.P.'s suggestion, the principal allowed W.P., who had been sitting calmly, to rejoin his class.

134.    Despite multiple meetings with NEST administrators since the beginning of the school year about how to address W.P.'s behavioral issues, the school initiated no

formal evaluation process until K.P. and G.P. submitted a formal written request for an IEP process on October 14, 2013.  Only then did NEST appear to have a social worker assigned to work on pursuing an evaluation for W.P.  Over the course of the past two months, K.P. and G.P. have spent considerable resources on private evaluations of W.P., as well as training of school staff.

135.    NEST's excessive and reflexively dramatic response to W.P.'s behavioral problems has created a situation in which K.P. and G.P. live in fear that the next phone call will be notification that their frightened five-year-old son has been taken to the hospital by EMS or the police because he had some difficulty in the classroom.  W.P. himself has expressed his worries that the police might take him away again.

### *J.R.*

136.    J.R. is a five year old first grade student currently attending Public School 149 in Manhattan. He lives with his mother, K.J., and grandmother, L.J., in Manhattan. J.R. has or is perceived by NYCDOE to have a disability.

137.    K.J. initially enrolled J.R. in kindergarten at PS 149 in January 2013. Prior to attending PS 149, J.R. attended a charter school.

138.    Soon after K.J. enrolled J.R. at PS 149, K.J. began to receive almost daily telephone calls from school staff at PS 149 regarding J.R.'s behavior. Most often, staff from PS 149 stated that J.R. was unfocused, not on task and acting up because he did not want to be in school. Often, school staff requested that K.J. pick up J.R. and bring him home prior to dismissal.

139.    If school staff were unable to reach K.J. by phone, they would call K.J.'s mother, L.J.  On a number of occasions, K.J. and L.J. were told that if they did not come

to pick up J.R. immediately, the school would call an ambulance to take J.R. to an emergency room.

140.    On one occasion, sometime between January 2013 and April 2013, school staff contacted K.J. advising her that an ambulance had been called for J.R. because he was acting out. K.J. could not leave work immediately and arranged for L.J. to go to the school in response to the phone call. L.J. arrived at the school before the ambulance and convinced school staff to allow J.R. to go home with her.

141.    On April 29, 2013, J.R. was involved in an incident at PS 149. He became upset after his teacher grabbed his hand during recess. He began to scream, jump on desks and throw himself against lockers.

142.    Staff at PS 149 called 911 and also contacted K.J. by telephone to advise her that they had called an ambulance for J.R.  K.J. was advised by school officials that J.R. could not return to the school until he was evaluated at the hospital. Because K.J. was at work, she could not go immediately to the school.  Instead, she contacted J.R.'s father, H.R.  He and L.J. then both proceeded to the school.

143.     L.J. arrived at school before H.R. and noticed that police officers and emergency medical technicians were all around J.R., were touching him, and had him sitting on the floor. L.J. asked the officers and technicians to get their hands off him. L.J. was then able to calm J.R. down. L.J. stated that she was going to take him home. School staff, the police officers and the emergency medical technicians all stated that J.R. had to go to the hospital. They stated that once an ambulance has been called to a school, the student has to go to the hospital.

144.    H.R. then arrived at the school and he accompanied J.R. to Mount Sinai Hospital in the ambulance. L.J. had to return to work and did not accompany them to the hospital.

145.    J.R. was admitted to the emergency room at Mt. Sinai at 12:45 p.m. The treating physician noted that officials at PS 149 had called EMS because they could not control his behavior and felt he needed an evaluation.

146.    When J.R. met with the doctor, he was sitting calmly and said he was no longer angry. He said that when he is very upset, he throws tantrums. He said he did not want to hurt himself or anyone else. The doctors diagnosed J.R. with disruptive behavior disorder and discharged him at 2:51 p.m. His discharge plan stated that he could return to normal daily activities and his parents were given referrals for him to outpatient mental health services.

147.    After this incident, K.J. wanted to find outpatient psychiatric services for J.R., but medical insurance issues prevented her from arranging an initial intake appointment for two months. Eventually, K.J. secured an initial appointment with a psychiatrist. However K.J. was concerned that the doctor immediately wanted to prescribe medication for J.R. without considering other options and decided to seek treatment elsewhere.

148.    As a result of the incident on April 29, 2013, PS 149 issued an out of school suspension to J.R.  He was sent to PS 144 in Manhattan for his suspension.

149.     On May 9, 2013, school staff from PS 144 contacted K.J. and advised her that J.R. was having an outburst. K.J. advised them that L.J. was going to the school to pick up J.R. Soon thereafter school officials then called back and stated that J.R. was

being transported to the hospital.  K.J. asked if they could delay sending J.R. to the hospital until she arrived there because she was unable to leave work immediately and the school official said no. L.J. arrived at PS 144 just as the emergency medical technicians were escorting J.R. out of the building. L.J. did not attempt to request that J.R. be allowed to go home with her because she felt the EMT's and the police would not allow her.

150.     J.R. was admitted to the emergency department at Mount Sinai Hospital at 1:35 p.m.  According to hospital records, he was calm, appeared well and was in no distress. The records state that J.R. got in trouble at school for running in the hall with another boy and was forced to sit at the "bad" table in the cafeteria. J.R. then got in trouble for standing up when he was not supposed to and was sent to the principal's office where he became angrier and acted out by hitting staff, yelling kicking, and trying to run away.  The records also state that J.R. told an emergency medical technician that he wanted to stab her.  According to his grandmother, J.R. said this in response to the EMT stating that J.R. was a "bad kid."

151.     J.R. was discharged at 3:41p.m., a little over two hours after he was admitted. The discharge documents noted that he was diagnosed with disruptive behavior disorder, not otherwise specified, and was cleared to return to normal activities.

152.     On May 15, 2013, after J.R. had completed his suspension at PS 144 and had returned to PS 149, K.J. was advised by staff at PS 149 that J.R. had been involved in another incident. She was told that J.R. had climbed on a cabinet during an outburst. The school informed her that J.R. would be sent to the hospital. K.J. contacted her

brother S.J. and he was able to go to PS 149 right away. K.J. asked school officials to release J.R. to S.J., but school officials denied K.J.'s request.

153. K.J. left work early in order to respond to the situation at PS 149. When she arrived at PS 149, K.J. observed EMS technicians and police officers with her son in addition to school staff. The EMS technicians, the police officers and school staff all told K.J. that J.R. had no other option than to go to the hospital. K.J. did not attempt to ask if she could take her son home because the police, school staff, and EMT's all made it clear on this occasion and on prior occasions that he had to be transported to the hospital.

154. EMS again transported J.R. to the emergency department at Mount Sinai where he arrived at 4:20 p.m. The treating physician noted that J.R. was calm and cooperative during his interview. J.R. denied being depressed, suicidal or homicidal. J.R. was unable to explain why he was aggressive at school but "nodded" in agreement that he did not want to be aggressive again.

155. The treating physician at Mount Sinai administered a violence risk assessment to J.R. and determined there was a low risk of violence. K.J. was advised to follow up with outpatient child psychiatry for J.R.'s disruptive behavior disorder. J.R. was discharged at 7:51 p.m.

156. In or about the middle of May 2013, PS 149 finally initiated an evaluation of J.R. to determine his eligibility for special education services. On June 21, 2013, an IEP team met and determined that J.R. was eligible for special education services. J.R. was assigned a classification of emotional disturbance. He has been assigned to a special class with a small student to staff ratio, but the school has

continued to respond inappropriately to J.R.'s behavioral problems. As recently as November 18, 2013, K.J. was again told that if she did not pick up J.R. as soon as possible, PS 149 would call for an ambulance to transport J.R. to an emergency room,

157.    K.J. often receives phone calls from PS 149 at work regarding J.R.'s behavior issues. The calls have caused K.J. to experience significant stress, anxiety and depression which affected her work performance. K.J. was suspended by her employer in May 2013 for poor work performance and has had to change her work schedule repeatedly to be able to respond to the constant calls from PS 149.

### J.M.

158.    Plaintiff J.M. is fifteen years old and is in the tenth grade at Astor Collegiate Academy in the Bronx.  He lives with his mother, C.J., in the Bronx. He was previously enrolled at Lehman High School ("Lehman") from the beginning of ninth grade through March 2013.

159.    J.M. was diagnosed with ADHD when he was five.  In July 2012, his diagnosis was changed to Asperger's Syndrome.  J.M. has or is perceived to have by NYCDOE a disability.

160.    When J.M. was in middle school at I.S. 206 in the Bronx, an IEP was developed for him.  The IEP included a crisis management paraprofessional, testing accommodations, group counseling, and a Behavior Intervention Plan.  The BIP included a provision permitting J.M. to call his mother during the day if he was feeling anxious as a last resort.

161.    In June 2012, Ms. J. met with Mr. Pagan, a guidance counselor, at Lehman to select classes and to fill out paperwork regarding J.M.'s high school

admission.  Mr. Pagan asked Ms. J. if J.M. had an IEP, and Ms. J. responded that he did.

Ms. J. asked Mr. Pagan if he was going to note this and he said he would, but he did not

do so in Ms. J.'s presence.

162.    In July 2012 at freshman orientation, before J.M. began attending

Lehman, Ms. J. met Thomasina Brown, who she later found out was J.M.'s guidance

counselor, and Mr. Carucci, the assistant principal for the Anne Hutchinson Academy at

Lehman.   Ms. J. had concerns about Lehman, so she took this opportunity to ask

questions of both of them.  Mr. Carucci explained the different academies at Lehman.

Ms. Brown answered questions about the school's orientation presentation.  J.M.'s

disability and the IEP were not discussed.

163.    On J.M.'s first day at Lehman in September 2012, Ms. J. saw Ms. Brown

again.   She approached Ms. Brown and asked to meet with all of J.M.'s teachers

regarding his IEP.  During the rest of September, Ms. J. tried to reach Ms. Brown many

times, but the phones at the school were not working properly so she was unable to

reach her or leave a message.

164.    On September 28, 2012, Ms. J. was at Lehman for a Parent Association

Executive Board meeting in her capacity as Vice President of the Parent Association.

While she was at the school, she went to say hello to Ms. Brown and on the way, she ran

into Ms. Brown and Mr. Tirado, one of the deans for the Ann Hutchinson Academy.

They told her that they were glad that she "caught them in the hallway" and asked her if

anyone had called her about J.M.   They told her that J.M. had used inappropriate

language with a girl in the lunchroom.  As a result, they pulled her into a conference

room to an unplanned meeting with Ms. J. and Ms. Brown; Mr. Tirado; Mr. Carruci; Ms.

Cabrejos, the Director of Student Services; and Ms. Cember, the Director of the committee on Special Education.

165.   At the meeting it became clear to Ms. J. that despite its being three weeks into the school year and even though she had already spoken to Ms. Brown twice about J.M., no one at the meeting was familiar with J.M.'s IEP.  Each administrator seemed to be looking at the IEP for the first time.  Ms. Brown admitted that she had not previously read the IEP.

166.   As they began to flip through the IEP, Ms. Brown said that the school had never provided group counseling, which is one of the support services provided in J.M.'s IEP. Ms. Cember suggested that the testing accommodation in J.M.'s IEP be removed and his disability classification be changed. Ms. Cember asked for Ms. J.'s permission to change J.M.'s IEP, but Ms. J. told them she was not interested in changes to the IEP before it had even been followed by school staff.  Rather, she expected them to first comply with the IEP.

167.   On November 9, 2012, Ms. J. found out from J.M. that he had attended his first group counseling session of the school year.  Ms. J. never received any notice from the school that the group counseling sessions had finally begun.

168.   On November 13, 2012, J.M. took a geometry test without the testing accommodations required by his IEP.  He felt he might have done poorly. Out of frustration, he ran a pen down his forearm.  He did not cut or scratch himself, but after this incident Ms. J. received a call from Principal Rose Lobianco, who told her that she had the opportunity to pick J.M. up from school as a "courtesy" and if she did not the school would call EMS to have him taken to a hospital. Ms. J. left to pick up J.M.

immediately. She received a total of five phone calls from Ms. Brown and Principal Lobianco as she was on her way to the school. They told her that J.M. hurt his arm. Ms. J. thought he needed to go to the doctor and called J.M.'s pediatrician to make an appointment while she was in the cab; she cancelled it later when she was told by the principal that the school nurse said J.M.'s arm was fine. She repeatedly asked to talk to J.M. and she was eventually permitted to speak to J.M., who was in the guidance counselor's office, where the nurse had checked his arm. When Ms. J. got to the school, he was still in the guidance counselor's office and Ms. J. took him home. Ms. Cabrejo wanted to speak with Ms. J. and Ms. J. declined to speak to her. Ms. J. took J.M. home and he stayed home from school the next day so he could go to the psychiatrist. J.M. explained to the psychiatrist that the reason for the incident was that he was frustrated and thought he did not do well on his test.

169.    After J.M. returned to school on November 15, Ms. Cabrejo and Dean Tirado repeatedly asked Ms. J. to provide a doctor's note saying that it was okay for J.M. to return to school.  Ms. J. declined to provide such a letter because she understood that the school had no right to require her to do so.

170.    After she declined to provide a letter to the school, the staff at Lehman retaliated by reporting to the City Administration for Children's Services ("ACS") that she was being neglectful of J.M.  The ACS investigator, Mr. Massaquoi, initially told her that staff at Lehman had accused her of neglecting J.M. because of scratches on his arm.  Later, Mr. Massaquoi told her the school was also accusing her of neglect because she was unwilling to reopen his IEP.  ACS's investigation found the report of neglect to be unfounded and the case was closed.

171.    Throughout the month of December, Ms. J. was repeatedly contacted by Ms. Cember, who continually asked Ms. J. to re-open J.M.'s IEP.  Ms. J. continued to refuse, stating that she expected the school to comply with the IEP before any consideration was given to modifying it.

172.    Because Ms. J. and J.M. were unhappy with Lehman, in December Ms. J. began the process of seeking a medical transfer to another school for J.M.'s sophomore year.

173.    On January 9, 2013, Ms. J. was at the school regarding paperwork for the transfer.  She had a disagreement Ms. Cabrejos, who was insisting on copies of all of the paperwork Ms. J. had to submit to the NYCDOE's Office of Student Enrollment before she would sign off on the transfer application.  Before Ms. J. left the school, she told J.M. that school was giving her a hard time about the transfer.

174.    J.M. was upset about the difficulty his mother was having regarding the transfer application and, at around approximately 12:00 p.m., his English teacher noticed he was agitated in class. He asked to call his mother, but his teacher refused.  Instead, she asked him to write down why he was feeling anxious.  He wrote down his feelings and as he was putting them away in his binder, his teacher demanded that he give her what he had written.

175.    J.M. had written, "Honestly I feel like something is bothering me and I don't know what, and it's making me get hype in a crazy way, and it's in a bad way.  I get something bothering me and it just gets me to the point I feel like I want to scream. Unable to work because of what's happening."

176.    After English class, J.M. was able to call his mother from the main office

before going to lunch and he then felt better.  J.M. continued throughout the rest of his school day without incident, but at the end of gym class, the last class of the day, Mr. Carruci and Ms. Brown came and escorted him to the principal's office.

177.    At 3:30, Ms. J. got a phone call from the principal, who told that the school had called EMS and that J.M. was going to be taken to the emergency room.  She received no "courtesy call" this time.  She asked why J.M. was being taken to the hospital and the principal told her she would find out when she got to the school.  While on the way to the school, Ms. J. called back to see if the ambulance left yet, and she asked to speak to an EMS worker. She spoke to the EMT and he said that the ambulance had not left the school yet. She asked them to take J.M. to Montefiore because Montefiore accepts her insurance and the EMS worker agreed. He said he would explain what happened when she got there. Ms. J. was not permitted to talk to J.M.

178.    Ms. J. arrived at the school around 3:50.  She asked if she could bring J.M. to the psychiatrist and she was told she could not.  In response to her question about why EMS had been called, the EMS worker showed her a written statement from J.M.'s English teacher in which she reported his agitation in her class and in which she claimed that, "Towards the end of the period, a girl started screaming in the hallway.  [J.M.] turned abruptly to face the door, pointed his fingers toward the door as if his hand was [sic] a gun and then shouted the sounds of a shooting gun." J.M. completely denies this. He has no recollection of anything even similar to this teacher's account.  After his English class, J.M. was permitted to continue with the rest of his school day without any intervention from the school's administrators or teachers.  They did not take him to the office or call EMS until two periods after English, until it was almost time for dismissal.

179.    EMS transported J.M. to Montefiore Hospital accompanied by Ms. J. According to an EMS worker, J.M.'s "chief complaint" was "I am fine."  The EMS worker noted that through the transport to the hospital, JM was observed to be "in position of comfort w/o change in status or further incident[]."  The "presumptive diagnosis" noted by the EMS worker was "behavioral eval for threatening remarks."

180.    In the emergency room J.M. was evaluated by a nurse, a medical doctor and a psychiatrist.  Each evaluation notes that J.M. was alert, cooperative and calm.  JM was discharged eight minutes after meeting with the emergency room psychiatrist.  The psychiatrist noted that J.M. had no current suicidal or homicidal ideation, plan or intent, that he was soft spoken, and that he was not dangerous.  The psychiatrist detailed that during the interview the "patient was calm and cooperative and responsive [illegible]."

181.    J.M. received no treatment from the hospital. J.M. was released without medication prescription and was simply advised to follow up with his own psychiatrist and was permitted to return to school the following day.

182.    Ms. J. has not received a bill from the emergency room, but her insurance was billed.

183.    In a mediation on March 21, 2013 about J.M's IEP, it was agreed that J.M. would transfer out of Lehman. On April 4, Ms. J. went to the Student Enrollment Office and found out he was transferring to Astor Collegiate Academy.  He began attending Astor on April 8, 2013.

184.    As part of the mediation, it was agreed that the school would develop a new IEP for J.M. for the 2013-2014 school year.

**N.R.**

185. N.R. is a six-year-old student who attends P.S. 19 in Queens. He previously attended P.S. 165, which is also in Queens. He resides with his mother, Y.P., in Queens. N.R. has or is perceived to have by NYCDOE a disability.

186. N.R. first enrolled at P.S 165 as a pre-kindergarten student during the 2011-2012 school year. In September 2012, N.R. entered kindergarten at the school.

187. At the beginning of the 2012-2013 school year, Y.P asked P.S 165 to evaluate N.R. for possible special education supports and services. She had made similar requests the year before, including a request for counseling in or about March of 2012 when N.R. attended pre-kindergarten at the school.

188. On October 4, 2012, Y.P. received a telephone call from the school informing her that N.R. was misbehaving by climbing under the table, jumping and throwing things and walking away. The school told her that the police had been called and threatened to have N.R. taken to the hospital. Y.P. asked school officials not to have N.R. taken to the hospital and to wait for her to get to the school from work, but they refused. Y.P. managed to contact her mother and asked her to go to the school to pick up N.R.

189. When Y.P's mother arrived at the school, N.R. was surrounded by police officers and school personnel and was sitting calmly. Nonetheless, the principal would not allow N.R.'s grandmother to take him home. Y.P. got on the phone with the school and demanded that N.R. be turned over to her mother. The school refused and handed the telephone over to the police. Only after Y.P. got on the phone with the police and

complained strenuously, did they release N.R. to his grandmother.   However, they threatened to arrest N.R. if he misbehaved in the future.

190.     Following this incident with the school, N.R. became fearful when he saw police, heard sirens, or saw police cars or ambulances.  He told his mother that he did not want to go to school because people at his school told him that they were going to call the police and the ambulance workers to come to get him.

191.     On or about October 10, the school contacted Y.P. and told her that her son was again misbehaving by running and jumping around, going under the table, and hitting others. She was told to pick up N.R., so she left work to go to the school.  When Y.P got there, she was told by school staff, Ms. Bonagura and Ms. Legions that N.R. could not return to school until he was psychiatrically evaluated and cleared by a doctor. They suggested that Y.P. take N.R. to Long Island Jewish Hospital (LIJH) for evaluation and told her that there must be something psychiatrically or neurologically wrong with N.R.

192.     Because Y.P. could not bring her son for an evaluation until October, 12, 2012, and because the school would not permit him to return without medical clearance, he could not attend school for two days, October 11 and 12.

193.     On October 12, Y.P. took N.R. to Long Island Jewish Hospital ("LIJH") in order to comply with the school's directive that he be evaluated and receive clearance before returning to school after the purported incident on October 10.  Doctors and other hospital staff met with N.R., spoke to his mother and contacted the school. Y.P. explained that the behavior reported by the school was not consistent with his behavior at home. Hospital staff noted that NR was "cheerful, cooperative though restless during

interview" and found that NR "does not present as an imminent risk of hurting self or others."  LIJH released N.R. and sent him home with his mother. They provided Y.P. with a referral for outpatient counseling for N.R. which she followed up on.

194.    On October 22, the school again called Y.P. at work and told her that EMS was at the school to take N.R. to the hospital.

195.    Y.P. begged the school not to send her son to the hospital via EMS and asked school staff to wait for her to come and pick up her son.  She was told by the principal and other members of staff that the school was in the business of teaching, not taking care of children and that they would not wait.

196.    Y.P. contacted her mother and asked her to go to the school to be with N.R. N.R.'s grandmother met him at the school and accompanied him to the hospital with EMS. Although N.R. was calm when his grandmother arrived, the principal and assistant principal would not let her take N.R. home and insisted that EMS take him to the hospital. EMS workers removed N.R. against the wishes of his mother and grandmother.

197.    Y.P. left work and went to LIJH to meet her mother and N.R. at the hospital as soon as she could.

198.    At the hospital, N.R. was seen by numerous hospital personnel, including doctors and social workers. Hospital staff spoke to N.R., who was "calm and cooperative," and called the school to find out why he had been sent by them.  They evaluated his condition and cleared him for release to his mother.

199.    At no time prior to the events of October 2012 did the NYCDOE convene an IEP  meeting or develop a Behavior Intervention Plan for N.R. nor, upon information and belief, did NYCDOE even complete a written evaluation of N.R.

200.    In February 2013, an IEP review meeting took place at Y.P's request and a recommendation was made for a 12:1:1 program in a community school for N.R.  The IEP also mandated a one-to-one paraprofessional, counseling, speech and occupational therapy services.   Thereafter, Y. P. enrolled N.R. at P.S 19 and he began attending a 12:1:1 program at the school.

201.    P.S. 19 failed to provide N.R. with a one-on-one paraprofessional and all of his mandated supports and services, despite Y.P's requests that the school do so. Staff at the school stated that they lacked resources and indicated that they would send her son to the ER if he misbehaved.   In addition, shortly after N.R. arrived at P.S. 19, school officials informed Y.P. that she would have to pick her son up from school each day at 11:00 a.m.  Fearing that the school would resort to inappropriate EMS intervention which would further traumatize her son, Y.P complied with this demand and collected her son early each day.

202.    The shortened school day caused Y.P. great hardship, forcing her to adjust her schedule at work and to work later hours in order to keep her job.

203.     Toward the end of the school year, Y.P met with school officials and again asked that NR receive all of his mandated IEP supports and services and that the school allow him to attend full-time as do all of the other children at the school.

204.    N.R. continues to be enrolled at P.S. 19.   N.R. and Y.P fear that at any moment the defendants may resort to inappropriate use of EMS to address N.R.'s special needs and cause N.R to again be unnecessarily and unlawfully removed to the hospital.

***D.E.***

205.    D.E. is a seven-year-old boy who was enrolled as a kindergarten student at P.S. K255 in Brooklyn for the 2011-2012 school year. He had just turned five on September 6, 2011. It was his first year at P.S. K255.

206.    D.E. is a special education student with an IEP.  D.E. has been diagnosed with an autism spectrum disorder ("ASD").  A Behavior Intervention Plan ("BIP") had been developed and established for DE in conjunction with his IEP. For the 2009-2010 and 2010-2011 school years, DE attended a special education pre-school at P.S. M226. D.E. has or is perceived to have by NYCDOE a disability.

207.    Though D.E. progressed remarkably well in terms of academic achievement and functional performance at P.S. M226, he exhibited social and behavioral deficits commonly associated with ASD. D.E. has significant difficulty with transitions, and becomes frustrated easily. D.E.'s frustration often manifests in the form of tantrums, which are common among children with ASD.  This information was well known to NYCDOE, and was clearly discussed in his IEP. At P.S. M226, whenever D.E. had a tantrum, school personnel responded appropriately and helped him to calm down, such that he would remain in school with his classmates.

208.    On June 7, 2011, following an IEP meeting, NYCDOE offered D.E. a placement in a 12:1:1 kindergarten classroom at P.S. K255. D.E.'s mother, M.E., complied with this recommendation.

209.    On September 22, 2011, after D.E. had been in kindergarten for about two weeks, he had tantrum at school.  P.S. K255 personnel notified Ms. E., and asked her to come to the school. When Ms. E. arrived, she spoke with school personnel, sat in class with D.E., and then took him home.

210.    On September 27, 2011, D.E. had another tantrum at school. D.E. showed no signs of injury. Nevertheless, P.S. K255 personnel summoned EMS and police, and then notified Ms. E. When Ms. E arrived, she found D.E., school personnel, EMS, and police in the school vestibule. D.E. was no longer having a tantrum, but a security guard was pinning him to the ground.

211.    Ms. E rushed to comfort her terrified son, and asked if she could take D.E. home, but EMS told Ms. E that D.E. had to be taken by ambulance to the Coney Island Hospital psychiatric ward. EMS put D.E. in an ambulance, and Ms. E rode in the ambulance with D.E. and EMS to Coney Island Hospital.

212.    Upon arriving at Coney Island Hospital, D.E. and Ms. E. were sent through the adult emergency room to triage. Afterward, they were told to wait for a pediatrician for a physical examination. The pediatrician only assessed D.E. and did not treat him or prescribe medication.

213.    D.E. and Ms. E. were then told to wait for a psychiatrist for a psychiatric consultation. The psychiatrist only assessed D.E. and did not treat him or prescribe medication.

214.    D.E. was then allowed to proceed to discharge on the basis that he did not require emergency services. The ordeal lasted approximately six hours, in which D.E. and Ms. E. were not allowed to leave and were neither provided food nor any

opportunity to get food. During that time, D.E. was hungry, tired, anxious, confused, and

desperate to leave the hospital.

215.    On October 6, 2011, D.E. had a tantrum at school. D.E. showed no signs

of injury, but P.S. K255 personnel again summoned EMS and the police, and then

notified Ms. E. Ms. E called her sister, Natasha Grall, and Ms. E and Ms. Grall each

hurried to the school. Ms. Grall arrived in fifteen minutes. When she arrived, she found

D.E., school personnel, EMS, and police in the principal's office. D.E. was no longer

having a tantrum.

216.    Ms. Grall wanted to take D.E. home, but EMS stopped Ms. Grall and told

her that D.E. had to be taken by ambulance to the Coney Island Hospital psychiatric

ward. Within ten minutes of Ms. Grall's arrival, Ms. E. arrived at the school by taxi.

EMS put D.E. in an ambulance, and Ms. E. rode in the ambulance with D.E., Ms. Grall,

and EMS to Coney Island Hospital.

217.    Upon arriving at Coney Island Hospital, D.E. and Ms. E. found

themselves in the same situation they had endured on September 27. First, they were

sent through the adult emergency room to triage. Afterward, they were told to wait for a

pediatrician for a physical examination. The pediatrician only assessed D.E. and did not

treat him or prescribe medication. D.E. and Ms. E. were then told to wait for a

psychiatrist for a psychiatric consultation. The psychiatrist only assessed D.E. and did

not treat him or prescribe medication. D.E. was then allowed to proceed to discharge on

the basis that he did not require emergency services. The ordeal lasted between four and

six hours, in which D.E. and Ms. E. were not allowed to leave and were neither provided

food nor any opportunity to get food. During that time, D.E. was just as hungry, tired, anxious, confused, and desperate to leave the hospital as he had been on September 27.

218.    On October 12, 2011, D.E. had a tantrum at school. D.E. showed no signs of injury. P.S. K255 personnel again summoned EMS and police, and then notified Ms. E. When Ms. E arrived, she found D.E., school personnel, EMS, and police in a classroom. DE was sitting under a table and was no longer having a tantrum, but he was crying and saying that he was scared of going to jail. Ms. E. asked if she could take D.E. home, but EMS told Ms. E that D.E. had to be taken by ambulance to the Coney Island Hospital psychiatric ward. EMS put D.E. in an ambulance, and Ms. E. rode in the ambulance with D.E. and EMS to Coney Island Hospital.

219.    Upon arriving at Coney Island Hospital, D.E. and Ms. E found themselves in the same situation they had endured twice before. After triage, a physical examination by a pediatrician, and a psychiatric consultation by a psychiatrist, D.E. was allowed to proceed to discharge on the basis that he did not require emergency services. The ordeal again lasted between four and six hours without breaks or food. During that time, D.E. was just as hungry, tired, anxious, confused, and desperate to leave the hospital as he had been on prior occasions.

220.    While at Coney Island Hospital on October 12, a nurse referred Ms. E. to a pediatric psychology walk-in clinic at Kings County Hospital Center. Ms. E. visited the walk-in clinic the next day, October 13, but clinic staff told her to return the following day, October 14. Ms. E. did so, and the walk-in clinic referred her to the Developmental Evaluation Clinic ("DEC").

221.    On October 14, 2011, Ms. E. met with a social worker at DEC for intake and to set up appointments for D.E. to be evaluated. The evaluations, including psychological and neurological evaluations, were scheduled to take place in late October and early November. Soon thereafter, Ms. E. notified P.S. K255 that D.E. was being independently evaluated. Ms. E had made attempts to have D.E. independently evaluated since September 28, the day after the first EMS incident, but had been denied services because of problems with her insurance.

222.    On October 26, 2011, while the DEC's independent evaluation of D.E. was ongoing, D.E. had a tantrum at school. D.E. showed no signs of injury. P.S. K255 personnel again summoned EMS and police, and then notified Ms. E. When Ms. E. arrived, she found D.E., school personnel, EMS, and police in the school library. Ms. Grall arrived separately at approximately the same time. D.E. was no longer having a tantrum. On this occasion, EMS told Ms. E. that she could take D.E. home. Ms. E. took D.E. home as permitted by EMS.

223.    That evening, the Administration for Children's Services contacted Ms. E. and told her that P.S. K255 personnel had filed an abuse and neglect report against her, alleging that Ms. E. had refused medical care for her son by refusing to allow EMS to take D.E. to Coney Island Hospital. ACS investigated the report but found it to be baseless, amended the report to show it was unfounded, and legally sealed the report.

224.    On November 9, 2011, D.E. had a tantrum at school. D.E. showed no signs of injury. P.S. K255 personnel again summoned EMS and police, then notified Ms. E. When Ms. E arrived, she found D.E., school personnel, EMS, and police on the third floor of the school. DE was no longer having a tantrum, but he was crying and saying

that he was scared of being in trouble. Ms. E. asked if she could take D.E. home, but EMS told Ms. E. that D.E. had to be taken by ambulance to the Coney Island Hospital psychiatric ward. EMS put D.E. in an ambulance, and Ms. E. rode in the ambulance with D.E. and EMS to Coney Island Hospital.

225.    Upon arriving at Coney Island Hospital, D.E. and Ms. E. found themselves in the same situation they had endured three times before. After triage, a physical examination by a pediatrician, and a psychiatric consultation by a psychiatrist, D.E. was allowed to proceed to discharge on the basis that he did not require emergency services. The ordeal again lasted between four and six hours without breaks or food. During that time, D.E. was just as hungry, tired, anxious, confused, and desperate to leave the hospital as he had been on prior occasions.

226.    In response to these incidents, D.E. became more and more resistant to going to school.  Ms. E was afraid that the pattern would never stop, and that whenever D.E. had a tantrum, P.S. K255 might contact EMS and police and further traumatize him. Ms. E. was also afraid that P.S. K255 personnel would continue filing baseless reports with ACS. As a result, Ms. E. began keeping D.E. home from school more often. If D.E. was acting up or having a bad day, Ms. E. decided that it was not worth the risk that he might tantrum, and be subjected to another EMS ordeal. Ms. E. also kept D.E. home unless she could accompany him to school, or was absolutely sure that, for the duration of the school day, either she or her sister would be close enough to the school to respond in the event that they were notified of a tantrum.

227.    On December 21, 2011, DEC professionals responsible for D.E.'s independent evaluation met to discuss their findings. On January 11, 2012, DEC released D.E.'s psychological evaluation report to P.S. K255 with Ms. E.'s permission.

228.    On February 15, 2012, an IEP meeting was held at which the school-based Committee on Special Education ("CSE") proposed that D.E. attend a 6:1:1 class at a District 75 school with speech language therapy, occupational therapy, and a 1:1 crisis paraprofessional. The program proposed by CSE would not be implemented until April 13, 2012, until which time D.E. would remain in his current, inappropriate program. Ms. E was worried that if kept in that inappropriate program, D.E. would continue to have tantrums and P.S. K225 personnel would continue to summon EMS and police in response.

229.    On February 17, 2012, in order to protect D.E. from further needless trauma, Ms. E withdrew her son from P.S. K255 and the public school system. Ms. E moved and re-enrolled D.E. in the public school system in Manhattan in April 2012. She was offered a placement at P226@875 in a 6:1:1 class. Ms. E. viewed the program and found it inappropriate for her son.

230.    On or about May 4, 2012 Ms. E. filed an administrative Impartial Hearing request under the IDEA, alleging the NYCDOE denied D.E. his right to a free and appropriate education for the 2011-2012 school year for the inappropriate actions of P.S. 255 and for the failure of the NYCDOE to recommend an appropriate program. Ms. E. sought prospective funding for a private school for children with autism at the DOE's expense for the remainder of the 2011-2012 school year and the 2012-2013 school year.

231.   On October 16, 2012, the Impartial Hearing Officer ("IHO") issued a decision granting the request that NYCDOE be required to pay for a private school placement for D.E. for the 2012-2013 school year.

**A.A.**

232.   A.A. is an eleven-year old boy. He lives with his mother, T.W.  in Brooklyn.  In September 2013, A.A. entered the 6th grade at P.S. 141.  A.A. has or is perceived by NYCDOE to have a disability.

233.   A.A. is a special education student with an IEP.  He has been described in his IEP's as having Asperger's Syndrome, emotional disturbance and ADHD.  In June 2013, A.A. graduated from P.S. 4, and then attended their summer program for two months. In September 2013, A.A. entered the 6th grade at P.S. 141 in an 8:1:1 alternate assessment setting.

234.   In September or October 2013, A.A. had a tantrum at school. P.S. 141 personnel notified Ms. W. at her workplace. Ms. W asked to speak to A.A. over the phone in order to try to calm A.A. down. After a few minutes on the phone with Ms. W., A.A. was no longer having a tantrum and then returned to his classroom.

235.   On November 6, 2013, A.A. had a tantrum in the lunchroom. A.A. had a disagreement with another student and threw his milk carton on the ground. A.A. refused to sit back down next to the student and began eating his potato chips. P.S. 141 personnel took A.A.'s potato chips from his hands and threw them in the garbage. A.A became upset and had a tantrum.

236.   School personnel summoned EMS and the police, and then notified Ms. W. at her workplace in Canarsie, Brooklyn. School personnel told her A.A. was being sent to the hospital and Ms. W told school personnel she would come to the school. Ms.

W. knew that it would take her a substantial amount of time to travel to the school from her workplace, so she suggested that her 31-year old daughter S.W. go to the school to be with A.A. until Ms. W. arrived. S.W. was already listed on A.A.'s blue emergency contact card to be contacted in case of an emergency. The school staff member said this was permissible. Ms. W. immediately notified her daughter S.W. of the situation.

237.    In the cab on the way to the school, Ms. W. again called her daughter, who was by then with A.A. at the school. S.W asked the EMS workers to allow her to take A.A. home. Ms. W. could overhear EMS telling S.W. that they were only allowed to release A.A. to his parents or the principal. The school principal was not on the scene. Ms. W. then asked S.W. to let her speak to EMS. EMS told Ms. W. that only if she arrived at the school within 10 minutes, they could release A.A. to her. Ms. W. told E.M.S. that she would be unable to make it to the school within that timeframe from her current location. EMS told Ms. W. that they would bring him to Interfaith Hospital and she would have to sign a form at the hospital for A.A. to be released to her. School personnel sent an aide with A.A. in the ambulance to the hospital.

238.    At or about 3:00 p.m., Ms. W. arrived at Interfaith Hospital where she found A.A. sitting near the desk in the emergency room with an EMS worker. A.A. was crying;  however, when he saw Ms. W. he immediately stopped crying. A.A. asked his mother if he was in trouble. He was told no and became very relieved. Ms. W. signed a form that she believed EMS had mentioned to her earlier that she could sign in order for A.A. to be released. Ms. W then proceeded to attempt to leave the hospital with A.A. A hospital staff member, however, stopped Ms. W. and threatened to call the

Administration for Children's Services if Ms. W. did not agree to wait to be seen by a doctor at the hospital. Ms. W. complied, fearful of the hospital staff member's threat.

239.     A.A. and Ms. W. waited approximately three hours before they saw a medical doctor. Ms. W. explained to the doctor that A.A. has autism. The doctor examined A.A. and asked him questions about the incident. The doctor did not note any bruises on A.A or other physical injuries. He did not prescribe medication, perform medical tests, x-rays, MRI's or conduct any other follow-up procedures.

240.     A.A. and Ms. W. were then told to wait for a psychiatrist for a consultation. A.A. and Ms. W. waited another two hours before seeing a psychiatrist. The psychiatrist assessed A.A. and asked him to retell the events of the incident. The psychiatrist did not conduct evaluations or offer referrals.

241.     A.A. was then allowed to be discharged. He received no medical or psychiatric treatment or medication by the doctors. The ordeal lasted approximately six hours, during which A.A. and Ms. W. were not allowed to leave and were provided food only upon repeated requests by Ms. W. During that time, A.A. was traumatized by the ordeal. He was scared, hungry, tired, anxious, confused, and desperate to leave the hospital. He was also forced to miss half the day of instruction at school.

242.     Ms. W. received a bill from the Fire Department of the City of New York in the amount of $714.80 dated December 3, 2013, for the ambulance. Ms. W. also received a bill from Interfaith Medical Center in the amount of $1,096.30 dated December 30, 2013, for the emergency room visit.

***S.D.***

243.     S.D. is an eight-year-old student with a Social Communication Disorder (SCD) and characteristics of Autism Spectrum Disorder (ASD).  He has an IEP and attends a third-grade general education class with related services at P.S 120 in Queens. S.D.  began attending P.S 120 in the spring of 2013, when he was in second grade.    SD resides with his mother, A.D., in Queens.  S.D. has or is perceived by NYCDOE to have a disability.

244.     A.D. has made a number of requests for additional supports and services for her son since S.D. began school at P.S 120 in April 2013.  Among other requests, A.D. has asked for a more appropriate classroom program, reinstatement of speech services and an appropriate behavior intervention plan (BIP). To date, NYCDOE has not provided S.D. with an appropriate program or appropriate supports and services or a meaningful behavior intervention plan formulated with appropriate input and participation of his parent.

245.     On October 31,  2013, A.D. dropped S.D. off at school.  Shortly after leaving, she received a telephone call from Jeng Feng, the guidance counselor at P.S 120. A.D. was told that S.D. was very upset because he was not allowed to wear his Halloween mask and refused to take it off.  She told A.D. to come to the school right away.

246.     A.D.  rushed back to school and was brought to the guidance counselor's office where she found her son locked in with the assistant principal, the guidance counselor and a security guard.  The security guard was standing in the doorway and would not allow A.D. to come into the room.  A.D. could see and hear S.D. crying and

calling for his mother through the glass.  The security guard told A.D. through the doorway that EMS had been called by the school and that S.D. would be transported to the emergency room.

247.    Only after A.D. demanded that she be allowed in and permitted to console her son, did school officials open the door. Within minutes, S.D. had stopped crying and was completely calm. The school told A.D. that S.D. had refused to take off his Halloween mask, would not listen and had had a tantrum.

248.    EMS workers arrived at the school shortly thereafter. Although SD was calm at this point and A.D. was prepared to take him home, school officials insisted that S.D. be removed to the emergency room and evaluated in order to return to school.

249.    A.D. accompanied her son and EMS workers to Elmhurst Hospital via ambulance.   Once at the hospital, S.D. was seen by a doctor, a nurse and other hospital staff.  S.D. was not permitted to leave until all of the various hospital staff had spoken with S.D. and his mother.

250.    Hospital staff found S.D. calm and cooperative and released him to his mother with a note authorizing him to return to school.  The ordeal lasted approximately five hours from transport to release from the hospital and was exhausting for S.D. and A.D . As a result of this experience, S.D. became reluctant to go to school and expressed that he did not feel loved by the school.

251.    A.D. received a statement that the hospital had billed approximately $1060.00 for their services, only a portion of which, $512.00, was covered by Medicaid.

252.    S.D. and his mother continue to fear that the school will contact EMS and will resort to having S.D. inappropriately transported to the hospital in the future when no medical necessity exists.

**C.R.**

243.    C.R. is a six year old boy who attends first grade at P.S. 396 in the Bronx.  He lives with his mother N.C.R. and his brother  in the Bronx.  C.R. has or is perceived by NYCDOE to have a disability.

244.    C.R. has received special education services since the age of three and currently his IEP recommends that he attend an inclusion class in a community school. The IEP provides a classification of autism for him and recommends that he also receive the related services of occupational therapy and speech and language therapy.

245.    The class that C.R. attends at PS 396 is part of a special program called ASD Nest, a program for high functioning students with autism spectrum disorders (ASD). The program provides an integrated co-teaching class in a community school with two teachers. The ASD Nest program is intended to help children learn how to function well academically, behaviorally and socially in school and in their community. C.R. has been attending the ASD Nest program at P.S. 396 since kindergarten in the 2012-2013 school year.

246.    Kindergarten was largely uneventful for C.R. until a few weeks before the end of classes. At that time, an incident occurred where C.R. was kicking, spitting and became upset. School officials thought it might have been because  C.R. was concerned about  some changes that had occurred in his classroom environment. During the summer of 2013, C.R. attended the summer program for ASD Nest and he had two

episodes of tantrums.

247.    Prior to the start of the school year in September 2013, administrators from P.S. 396 called N.C.R. and told her  that C.R. would have the same teachers from the prior school year, Stacey Garzione and Ashley Auchmoody. School officials also asked C.R. to come to school to look at the class prior to the start of school to ensure he had a proper adjustment to the new classroom. N.C.R. noticed that C.R. was not happy when he saw the classroom and she felt that C.R. appeared not to want to interact with the teachers.

248.    On or about September 12, 2013, officials from P.S. 396 called N.C.R. regarding an incident with C.R. N.C.R. immediately went to school and upon entering the principal's office she saw Theresa Castillo, the Nest Program Coach, restraining C.R. while the principal, Nicole Tine, was holding his ankles together on a bean bag. C.R. was not crying and appeared to be relaxed and not resisting. N.C.R. started crying but made sure she was not seen by C.R. since he has never seen her cry. Principal Tine spoke to N.C.R., but N.C.R. does not recall what was said because she was extremely upset. N.C.R. eventually took C.R. home. N.C.R. never received any written documentation regarding the incident on September 12, 2013. Afterwards, C.R. explained to N.C.R. that he does not like his teachers and that it is boring in the class.

249.    On or about September 25, 2013, N.C.R. received a call from C.R.'s teacher stating that C.R. was out of control and Principal Tine was going to call EMS and then would call her. Principal Tine called N.C.R. and stated that if C.R. did not calm down in ten minutes then they would call EMS. Principal Tine stated there were four security guards with him and that C.R. might have to go to the emergency room because

he had threatened to kill her. N.C.R. asked her with what C.R. had threatened to kill her with and the principal did not answer. N.C.R. told Principal Tine that she believed the school ought to be able to deal with C.R. without needing EMS. Principal Tine responded by saying, "I can't sit here all day with him, it is not my job" and the conversation ended. N.C.R. was at an appointment and was unable to go to the school. School officials called later  that day and stated that C.R. was placed in a kindergarten class and he did better.

250.    On or about September 28, 2013, N.C.R. raised concerns about her son's behaviors to school officials. Ms. Costello gave N.C.R. three options: get counseling for her son outside of school; have the school conduct a Functional Behavior Assessment ("FBA"); or have C.R. see a psychiatrist. N.C.R. chose the FBA option and made the request to school officials. Ms. Costello stated that she would be conducting the FBA.

251.    At or about the end of October 2013, an IEP meeting was held for C.R. At the meeting, N.C.R. suggested using a weighted vest as a way to calm C.R. down but Ms. Auchmoody said it was not necessary. N.C.R. also suggested that C.R. be taken to the gym to calm down when he gets upset. The school officials at the meeting seemed to ignore all of her suggestions.

252.    In or about October 2013, N.C.R. received a call from Ms. Tine regarding C.R. Ms. Tine stated that C.R. was screaming and would not calm down. She requested that N.C.R. come to the school to pick him up . When N.C.R. arrived at the school, she saw Ms. Tine restraining C.R. by straddling him on top of a bean bag. Ms. Tine told N.C.R. that C.R. had been kicking and screaming for the last forty-five minutes. N.C.R. could see that C.R. had been crying. N.C.R. then proceeded to take her son home.

253.    In or about November 2013, N.C.R. learned that the school had not given C.R. a permission slip for a class trip. N.C.R. learned about the trip only when she went to school to check in on her son and noticed the entire class was ready to go on the trip and C.R. was not dressed to leave with the class. The teacher stated that he had been defiant and would not be able to attend the class trip. In fact, the school has since maintained a policy that, rather than providing a reasonable accommodation, it will not permit C.R. to go on any trips unless N.C.R. is available to accompany him. On three to four occasions, N.C.R. has been unable to accompany C.R. and he was not allowed to attend the planned trips.

254.    On November 15, 2013, C.R. was involved with an incident in his class during which he became agitated because he wanted to leave the room and his teachers would not let him do so. Ms. Garzione videotaped C.R. with her iPhone as he was trying to leave the room. Ms. Garzione provided a copy of the videotape to N.C.R. N.C.R. had not provided permission to school officials to videotape her son. However, N.C.R. signed a release granting permission for the school to videotape C.R. for educational purposes on November 18, 2013.

255.    On November 25, 2013, at around 9:15 a.m., N.C.R. received a call from C.R.'s teacher, Ms. Auchmoody, who told her to come and pick up C.R. from the school. N.C.R. told Ms. Auchmoody that it would take her more than an hour to arrive at the school given her location and in addition, she had a 10:00 a.m. appointment.  Ms. Auchmoody proceeded to state that Principal Tine would call EMS if C.R. was not calm within the next 10 minutes.  N.C.R. believes C.R. was upset because the school officials did not want to take C.R. on a field trip to the Museum of Natural History on that

day.  Ms. Auchmoody sent N.C.R. an email earlier that morning stating that C.R. was welcome to go on the trip only if N.C.R. accompanied him.  If not, C.R. was going to be placed in a kindergarten classroom.

256.    In or about November 2013, based on the advice of school officials, N.C.R. took C.R. to the North Central Bronx Hospital emergency room to be seen by the Crisis Intervention Program.  The doctor at NCBH told N.C.R. that C.R. was fine, but that the school should add a behavioral plan to his IEP.  N.C.R. relayed this information to school officials but instead of acting on this information, Ms. Costello gave N.C.R. a flyer and suggested that she take her son to see a psychiatrist at an agency called YAI.

257.    On or about December 12, 2013, Ms. Hollinger called N.C.R. and stated that C.R. was in her office and that he was crying and carrying on badly. She requested that N.C.R. come to the school. N.C.R. told her she was on her way but that she was far away from the school. Ms. Costello called soon after and said they had called an ambulance and C.R. might be at the hospital by the time she arrived. N.C.R. asked why they had called for an ambulance. Ms. Costello said C.R. was hitting and kicking and spitting at staff members. During the phone conversation with Ms. Costello, N.C.R. arrived at school and observed Ms. Fishman videotaping C.R. in Ms. Hollinger's office through the glass windows of the door.  N.C.R. asked why they were videotaping C.R. Ms. Fishman stated she was videotaping because she wanted show how C.R. was behaving.  When N.C.R. looked into the room, she saw C.R. swing his arm after Ms. Hollinger in an effort to make her leave him alone.  C.R. appeared not to be angry or extremely upset. N.C.R. then asked what happened and was told that C.R. had become upset at Ms. Fishman when she came to take him to his occupational therapy

session.  C.R. told N.C.R. that Ms. Fishman came to get him but he did not feel like

going, and Ms. Fishman said in a loud voice, "It's not a choice!" C.R. said he turned his

back to her and she touched him.  He said he told her do not touch him, but she touched

him again a second time. After the third time, C.R. he repeated to her "do not touch me"

and then he turned around and scratched at Ms. Fishman.  N.C.R. asked Ms. Fishman

why she would force him to go with her if he told her he did not want to and she

responded that occupational therapy is mandatory.

     258.    As N.C.R. began to leave with C.R., Assistant Principal Rebecca Odessey

stopped N.C.R. and said Principal Tine had said that N.C.R. and C.R. could not leave.

N.C.R. would have to wait for the ambulance to arrive and to tell them she did not want

C.R. to be taken to the hospital.  N.C.R. asked Ms. Odessey if she was required by law

to stay and wait for the ambulance. Ms. Odessey proceeded to speak with Principal Tine

and later told N.C.R. she could leave if she wanted to.

     259.    On December 18, 2013, N.C.R. received a call from school officials

stating that C.R. was involved in an incident. N.C.R. proceeded to the school and

learned that the school had called for an ambulance. Upon her arrival, N.C.R. observed

that C.R. was calm  and that he was playing on an iPad in the guidance office. Two

police officers arrived in response to the call for the ambulance. Subsequently, an

ambulance arrived as well. N.C.R. refused treatment from the EMT's. N.C.R. asked

school officials for an explanation about the incident and school officials did not provide

one.

     260.    Subsequently, in or about February 2014, N.C.R. received a school

document stating that on December 18, 2013, C.R. had refused to wash his hands when

asked and had started to hit, spit, kick and pinch the teacher. The document also states that he head-butted the teacher and was shaking and screaming. When other staff members responded, C.R. allegedly engaged in the same behaviors with each staff member.

261.    On or about January 9, 2014, N.C.R. received a call from officials at P.S. 396 stating that C.R. had kicked a teacher and that they were calling an ambulance. N.C.R. was at the school when the EMTs arrived. The EMTs encouraged N.C.R. to allow them to take C.R. to the hospital. N.C.R. refused the services and had to take C.R. home because school officials would not allow C.R. back into the classroom. Later that day, N.C.R. received a call from Roxanne Batista, Administrator for Special Education for the Children's First Network 109, the network within NYCDOE that provides support for P.S. 396, advising her that C.R. would have to be picked up each day at 12:00 noon because of his behaviors.

262.    N.C.R. subsequently obtained a school document in or about February 2014 stating that on January 9, 2014, C.R. was being aggressive towards three teachers (Meg Heubel, Stacey Pagan, Ashley Auchmoody) and the principal. The document states that C.R. kicked, punched, pulled their hair, spit at them, and yelled, "die."

263.    On January 13, 2014, N.C.R. received a call from Ms. Hollinger who stated that C.R. needed to be picked up at noon. In response to N.C.R.'s objections, Ms. Hollinger stated that the truncated school schedule was mandated for the remainder of the school year.

264.    N.C.R. did not pick up her son at noon. Principal Tine called N.C.R. at around 12:45 p.m. and stated that C.R. had been "tantruming" for thirty minutes and that

she might have to call for an ambulance again. N.C.R. responded that she did not have the cab fare to get to the school quickly so it would take at least thirty minutes. Principal Tine responded that she would only wait twenty minutes for N.C.R. to arrive before she calls for the ambulance. Principal Tine stated further that the school is not equipped to deal with C.R.'s behavior.

265.    Between October 2013 to January 2013, N.C.R. contacted school officials to get updates on the progress of the FBA.  Anna Martinez Hollinger, the school guidance counselor, told N.C.R. that "these things take time."

266.    On February 13, 2014, an IEP meeting was held at P.S. 396 to determine the appropriate education program and services for C.R. The team agreed to defer C.R.'s case to the Central Based Support Team for non-public school placement. At the meeting, N.C.R. learned that the FBA and BIP had been completed in December although she was never involved in its development.

267.    Between October 2013 and January 2014, N.C.R. was threatened on or about fifteen separate occasions by school officials that they would send C.R. to the hospital emergency room if she did not go to the school and take C.R. home.  N.C.R. believes the school has been provoking C.R. The situation has severely affected her studies and her sleep. She finds herself exhausted and nervous every day. She fears that every time her phone rings it is the school calling her to pick up C.R.

*Q.A.*

268.    Q.A. is twelve years old and is in the sixth grade.  He previously attended the Young Scholars Academy.  He lives with his mother, I.S., in the Bronx. Q.A.  has or is perceived by NYCDOE to have a disability.

269.   On October 17, 2013, Q.A. was in the gym at the Young Scholars Academy with a friend. The gym teacher told him not to do a back flip.  Q.A. did not follow the teacher's instructions. The teacher asked him to leave the gym and go to the Safe Schools against Violence in Education ("SAVE") room, which in most schools is a room the school uses for students who have misbehaved and for in-school suspensions. Q.A. expressed his belief that he had not done anything wrong, and refused to go.

270.   The school contacted his aunt on the phone and told her that Q.A. did not want to go to the SAVE room.  While she was on the phone with Q.A.'s aunt, the principal put her arm out to block Q.A. and he bumped into her.  Q.A.'s aunt spoke with him and told him that he needed to apologize.  Q.A. did apologize. The principal told his aunt on the phone that they were sending Q.A. to the hospital, that he had to leave the school, and that they could not wait for his mother to arrive.  The school called EMS, and Q.A. was taken by ambulance to North Central Bronx Hospital, accompanied by the school guidance counselor.  Q.A. expressed the desire to speak with his mother, but was told he could not speak with her until he arrived at the hospital.   I.S. arrived at the hospital subsequently.

271.   Q.A. was seen by hospital staff. The admitting notes indicate that he was hostile and aggressive towards school staff. Q.A. was discharged the same day with instructions that he return to school.

**R.T.**

272.  R.T. is a five-year-old boy enrolled in Kindergarten at P.S 86 in Queens.  He resides with his mother, R.M.T., in New York City.  R.T. has or is perceived by NYCDOE to have a disability.

273.  During the 2012-2013 school year, RT attended prekindergarten at Heartshare in Queens, New York.

274.  R.T. began attending school at P.S 86 in September 2013.  At the time of his enrollment, R.T. had an IEP classifying him as having a speech or language impairment and placing him in a 12:1:1 program.

275.  R.T. 's IEP noted that he displays challenges with sensory integration that impacts his need for movement and challenges his ability to focus and attend for longer periods of time.  The IEP also notes that he has severe language delays, challenges with, among other things, visual motor activities, fine motor skills, transitioning, frustration tolerance and emotional control and transitioning.  He benefits from among other things positive reinforcement and multisensory learning, frequent breaks and an opportunity to get used to new situations.

276.  Shortly after beginning school at P.S 86, R.M.T. began receiving frequent calls or verbal reports of R.T.'s behavioral issues at school.  On numerous occasions, R.M.T. was called and asked to bring R.T. home during the school day.

277.  According to school officials R.T. engaged in a variety of behaviors such as not following instructions, climbing under desks, running around the classroom, knocking into things, throwing items and hitting.

278.  R.M.T.  reached out to and met with school officials a number of times to attempt to address R.T.'s behavioral and learning needs and to make suggestions about how to help him.   She also requested a functional behavior assessment, a behavior intervention plan, and additional supports for her child.

279.  On October 17, 2013 RMT was at P.S 86 meeting with  Marilyn Maldonado, the school's social worker for a social history.  She attended the meeting with Michelle McCusker, a teacher who had worked with R.T. at his previous school, Heartshare.   The school principal disrupted the meeting by announcing that "[R.T.] is at it again."

280.  R.M.T. followed staff members downstairs and saw that R.T. was reluctant to go to speech therapy.  While staff members gathered around him and attempted to tie his shoes, he kicked off his shoe.  Ms. Thurston and R.T.'s former teacher were able to easily redirect R.T. and explain that the new speech lady was just like the speech lady at his old school.  R.T. complied with the request that he go to speech therapy after his mother and former teacher spoke with him clearly and calmly.

281.  Later that day, R.M.T. received a telephone call from the school informing her that the school had called EMS to take R.T. to the emergency room because he was misbehaving and that she should meet him there.

282.  Although the child was reportedly "calm and cooperative" when EMS arrived, he was nonetheless removed to the hospital at the urging of the school.

283.  R.T. was seen by doctors and other hospital staff who spoke to him and contacted the school.  The school purportedly told hospital staff that R.T. had engaged in behavior that included running around, not listening to redirection, head butting, putting magnets in his mouth and picking up scissors in the guidance counselor's office "in a threatening way."

284. Hospital staff reported that the R.T.'s behavior was cooperative, found no suicidal or homicidal ideation and released R.T. to R.M.T.  The hospital visit lasted approximately four hours and confusing and stressful for both R.T. and R.M.T.

285. On November 15, 2013, R.T. was attending P. S  117, an alternative education site where he was serving a suspension for purportedly stomping on a teacher's foot.  Staff there contacted R.M.T. and told her they had  called EMS and were sending R.T. to the hospital because he was crying and having a tantrum.  R.M.T. begged the school not to send her R.T. to the emergency room, but school staff refused to wait for R.T. to get to the school and said they had to send him to the hospital.  R.T. was transported to the emergency room by EMS and a school aid for allegedly acting out and jumping on chairs, but he was calm when he arrived.

286. R.M.T. proceeded to the hospital.  When she arrived, R.T. was calm.  While at the hospital, R.T. was seen by various hospital staff.

287. The attending doctor noted that R.T. was calm and cooperative in the emergency room and was not depressed, manic or psychotic.  He was not found to be suicidal or homicidal and was released to R.M.T. after spending  approximately three and a half hours in the emergency room. R.T. and R.M.T. were tired and hungry and upset by this experience.

288. After this second removal of R.T. to the emergency room, R.M.T. expressed her concern to school officials about the school's practice of calling EMS to remove R.T. and instructed P.S 86 not to call 911 to have the child removed from the school again without her consent.

289.   On November 25, 2013, R.T.'s first day back at his home school, he was again transported to the emergency room at the request of school officials at P.S 86 due to purported disruptive behavior without his parent's consent.

290.   While at the hospital on November 25, R.T. again underwent evaluation by various doctors and hospital staff who spoke to him and also contacted the school.

291.   According to hospital records, the school purportedly told the hospital that R.T. had put batteries in his mouth.  The doctor noted that R.T. "impulsively puts things in his mouth at baseline and expressed no plan or intent to harm himself."  According to hospital records, R.T. did not display signs of suicidality, homicidal thoughts or aggressive behavior in the hospital and was hyperactive but cooperative and under control in the emergency room.

292.   As a result of the removals of R.T. against her will, R.M.T. became increasingly concerned about leaving R.T. with staff at the school and fears that Defendants will continue to inappropriately remove R.T. to the E.R .  The removals have also been stressful and upsetting for R.M.T. and for R.T., who feels ostracized from his school community and disliked by his teachers and other school staff and administrators.

293.   R.M.T. has received bills from FDNY for the trips to the emergency room which she cannot pay.


### FIRST CLAIM FOR RELIEF: UNREASONABLE SEIZURE

(On behalf of Plaintiffs J.H., J.R., N.R., J.M., D.E., A.A.,
S.D., Q.A., and R.T. against all defendants)

294.   Plaintiffs incorporate the above paragraphs as if fully set forth herein.

295.    By physically removing plaintiff from their schools to hospital emergency rooms when there was no medical necessity to take such actions, defendants violated plaintiffs' rights against unreasonable seizure under the Fourth Amendment of the United States Constitution and Article I, Section 12 of the New York State Constitution.

296.    A claim for violation of plaintiffs' rights under the United States Constitution is made actionable by 42 U.S.C. Section 1983.

## SECOND CLAIM FOR RELIEF:  FOURTEENTH AMENDMENT

(On behalf of Plaintiffs T.H., J.H., K.J., J.R., C.J., J.M., Y.P, N.R., M.E., D.E., T.W., A.A., A.D., S.D., I.S., Q.A., R.M.T., and R. T. against all defendants)

297.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

298.    By removing plaintiff children from school to emergency rooms against their parents' instructions or without their parents' consent where there was no urgent medical necessity, defendants violated plaintiff parents right to authorize and direct the medical care given to their children. By forcibly removing plaintiff children from the school to emergency rooms against or without their parents' consent where there was no urgent medical necessity, defendants violated the liberty interest of plaintiff parents and children to association and family integrity.

299.    By preventing plaintiff parents and children from communicating prior to the removal of plaintiff children from the school where the plaintiff parents request the opportunity to speak with their plaintiff children, defendants violated the liberty interest of plaintiff parents to associate and maintain family integrity.

300.    A claim for violation of plaintiffs' rights under the United States Constitution is made actionable by 42 U.S.C. Section 1983.

**THIRD CLAIM FOR RELIEF:  IDEA**

(On behalf of all of the plaintiff children against Defendants Fariña , New York
City Department of Education, and the City of New York)

301.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

302.    By failing to evaluate the psychological, behavioral, and educational

needs of the plaintiffs and opting instead to transport them or threaten to transport them

by EMS away from their schools, defendants have violated plaintiffs' rights under the

IDEA.

303.    By removing or threatening to remove plaintiffs from the regular

educational environment using EMS to address behavior concerns rather than using

supplementary aids and services, defendants have violated plaintiffs' rights under the

IDEA to be educated in the least restrictive environment.

304.    By failing to address plaintiffs' behavioral issues with a behavioral

intervention plan, defendants have violated plaintiffs' rights under the IDEA.

305.    By requiring a clearance letter before allowing these plaintiffs to return to

the regular classroom setting, defendants have deprived plaintiffs of their rights under

the IDEA to a free and appropriate public education by establishing an illegal pre-

condition to the receipt of their educational services.

**FOURTH CLAIM FOR RELIEF:  IDEA**

(On behalf of all of the plaintiff parents against Defendants Fariña , New York
City Department of Education, and the City of New York)

306.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

307.    By transporting students to emergency rooms by EMS for evaluations or

threatening to do so instead of following the IDEA evaluation process, defendants have

deprived the parent plaintiffs of their rights under IDEA to consent or withhold consent to evaluations of their children.

## FIFTH CLAIM FOR RELIEF:  REHABILITATION ACT

### (On behalf of all plaintiff children against all defendants)

308.   Plaintiffs incorporate the above paragraphs as if fully set forth herein.

309.   By removing plaintiffs from their schools by EMS or threatening to do so when defendants had no reasonable basis for believing that plaintiffs were in need of emergency medical care, defendants have excluded plaintiffs from participation in a federally funded program by reason of their disabilities or perceived disabilities in violation of the Rehabilitation Act.

310.   By removing plaintiffs from their regular school setting and placing them with EMS and in hospitals rather than providing appropriate support and services in the school, defendants violated plaintiffs' right to a public education in the least restrictive setting under the Rehabilitation Act.

311.   By requiring a clearance letter before allowing these plaintiffs to return to the regular classroom setting, defendants created an additional barrier for these plaintiffs based solely on disability or perceived disability, in violation of the Rehabilitation Act.

## SIXTH CLAIM FOR RELIEF:  ADA

### (On behalf of all plaintiff children against all defendants)

312.   Plaintiffs incorporate the above paragraphs as if fully set forth herein.

313.   By removing plaintiffs from their schools by EMS or threatening to do so when Defendants had no reasonable basis for believing that plaintiffs were in need of emergency medical care, defendants have discriminated against plaintiffs by reason of their disabilities or perceived disabilities.

314.    By removing plaintiffs from the educational setting using EMS or threatening to do so, rather than providing appropriate support and services in the school, defendants failed to administer educational services in the least restrictive setting appropriate to plaintiffs' needs in violation of the ADA.

315.    By requiring plaintiffs to secure a clearance letter prior to allowing a return to the classroom, defendants impose a safety requirement based on mere speculation, stereotype and generalizations about individuals with disabilities or perceived disabilities, in violation of the ADA.

**SEVENTH CLAIM FOR RELIEF:  NEW YORK CITY HUMAN RIGHTS LAW**

(On behalf of all plaintiff children against all defendants)

316.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

317.    By removing plaintiffs from their schools by EMS or threatening to do so when there was no reasonable basis for believing that plaintiffs were in need of emergency medical care, defendants deprived plaintiffs of access to and the advantages of a public accommodation due to their disabilities or  perceived disabilities in violation of Administrative Code of the City of New York §8-107(4)(a).

318.    By requiring a clearance letter prior to allowing plaintiffs to return to the classroom, defendants deprived plaintiffs of their right to an education due to their disabilities or perceived disabilities in violation of Administrative Code of the City of New York §8-107(4)(a).

**REQUEST FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request that this Court enter a final judgment:

1.      Declaring that defendants' practice of removing students from their
schools by EMS when there is no reasonable basis for believing that they are need of
emergency medical services violates the United States Constitution, the  IDEA, the
Rehabilitation Act, the ADA, the New York City Human Rights Law, the Chancellor's
Regulations, and FDNY Regulations;

2.      Declaring that defendants' practice of prohibiting students from returning
to school without a clearance letter from a doctor violates the IDEA, the Rehabilitation
Act, the ADA, and the New York City Human Rights Law;

3.      Permanently enjoining Defendants City of New York, NYCDOE, and
Fariña to provide school personnel with the training and resources they need to address
disruptive student behavior without removing students from school by EMS when there
is no reasonable basis for believing that they are in need of emergency medical services;

4.      Permanently enjoining Defendants City of New York, NYCDOE, and
Fariña  from removing students from their schools by EMS when there is no reasonable
basis for believing that they are need of emergency medical services;

5.      Permanently enjoining Defendants City of New York, NYCDOE, and
Fariña  to comply with the evaluation requirements of IDEA, including the Child Find
requirement, for all students who display behavioral difficulties that interfere with their
educations;

6.      Permanently enjoining Defendants City of New York, NYCDOE, and
Fariña  from requiring families to provide letters from medical providers prior to
permitting students who have or are perceived to have a mental illness or a behavioral
disability to return to school without due process of law;

7.      Permanently enjoining Defendants City of New York and Cassano from using or permitting EMS to remove  children from New York  City public schools over the objection of their parents or other guardians except when a child has a life-threatening condition or injury and it is apparent that even a minor delay will jeopardize the life or health of the minor;

8.      Awarding the plaintiffs damages in an amount to be determined at trial;

9.      Awarding the plaintiffs interest, costs and attorney's fees incurred in the pursuit of this action; and

10.      Granting such other and further relief as this Court may deem just and proper.


Dated: Bronx, New York
         March 17, 2014



                                                  Respectfully submitted,

                                                  s/Christopher D. Lamb

                                                  _____
                                                  Nelson Mar
                                                  Tara Foster
                                                  Nancy Bedard
                                                  Maura McHugh Mills
                                                  Christopher D. Lamb
                                                  Ann P. Biddle
                                                  Nanette Schorr
                                                  Tanya Douglas

                                                  Legal Services NYC
                                                  349  E.149th Street
                                                  Bronx, New York 10451
                                                  (718) 928-3756

Attorneys for Plaintiffs T.H., J.H.,
K.J., J.R., C.J., J.M., Y.P., N.R.,
M.E., and D.E.


Mariann Wang
Cuti Hecker Wang LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2063

Attorneys for Plaintiff W.P.